WILSON v STILWILL

Docket No. 63782. Argued October 8, 1980 (Calendar No. 8).—Decided
    September 1, 1981.

    Irving J. Wilson and Margaret D. Wilson brought an action for
    medical malpractice against George D. Stilwill, M.D., an ortho-
    pedic surgeon, and Edward W. Sparrow Hospital Association.
    The plaintiffs claimed that damage to Irving Wilson's arm,
    which is now paralyzed, was caused by a post-operative infec-
    tion resulting from negligence. Counsel for Dr. Stilwill was
    permitted to cross-examine the plaintiffs' expert witness, over
    the plaintiffs' objection, about other medical malpractice trials
    in which he had testified, until the trial court sustained the
    plaintiffs' renewed objection. At the close of the plaintiffs'
    proofs the Ingham Circuit Court, Thomas L. Brown, J., directed
    a verdict for the defendant hospital, on the ground that there

REFERENCES FOR POINTS IN HEADNOTES

[1] 81 Am Jur 2d, Witnesses § 472.
[2] 81 Am Jur 2d, Witnesses § 507.
[3, 4, 17] 31 Am Jur 2d, Expert and Opinion Evidence §§ 45, 48.
[4] 31 Am Jur 2d, Expert and Opinion Evidence § 46.
[5] 31 Am Jur 2d, Expert and Opinion Evidence § 50.
    81 Am Jur 2d, Witnesses § 519.
[6, 12, 13] 31 Am Jur 2d, Expert and Opinion Evidence §§ 45, 48, 50.
[7, 8, 15, 16] 75 Am Jur 2d, Trial §§ 274, 305.
[9] 40 Am Jur 2d, Hospitals and Asylums § 41.
    61 Am Jur 2d (Rev), Physicians, Surgeons, and Other Healers
        §§ 333, 335.
    Res ipso loquitur in action against hospital for injury to patient. 9
        ALR3d 1315.
[10] 40 Am Jur 2d, Hospitals and Asylums § 28.
    61 Am Jur 2d (Rev), Physicians, Surgeons, and Other Healers
        §§ 286, 289, 333.
[11] 31 Am Jur 2d, Expert and Opinion Evidence § 148.
    61 Am Jur 2d (Rev), Physicians, Surgeons, and Other Healers § 205.
    Necessity of expert evidence to support action against hospital for
        injury to or death of patient. 40 ALR3d 515.
[14] 31 Am Jur 2d, Expert and Opinion Evidence § 50.
    Cross-examination of expert witness as to fees, compensation, and
        the like. 33 ALR2d 1170.

was no evidence that the hospital's sterilization procedures were improper or caused the infection. Counsel for Dr. Stilwill argued to the jury that the defense had consulted physicians who were the best qualified in Michigan on the issues in this case rather than going to "professional witnesses". In rebuttal the plaintiffs' counsel argued, in effect, that the defense counsel's remark reflected unfairly on the plaintiffs' expert witness. The trial court denied the plaintiffs' request for a special cautionary instruction as to the remarks but gave a general instruction that the arguments, statements, and remarks of attorneys are not evidence and that the jury should disregard anything said by an attorney which is not supported by the evidence. The jury returned a verdict of no cause of action. The Court of Appeals, M. F. Cavanagh, P.J., and V. J. Brennan and Carroll, JJ., affirmed, after concluding that defense counsel's remarks fairly characterized the plaintiffs' witness (Docket No. 77-4333). Plaintiffs appeal.

In an opinion by Justice Moody, joined by Chief Justice Coleman and Justices Fitzgerald and Ryan, the Supreme Court *held:*

1. The scope and duration of cross-examination of witnesses rests in the sound discretion of the trial court. The exercise of that discretion will not be reversed absent a clear showing of abuse. The credibility of the expert witnesses is a primary question for consideration by the jury in a trial for medical malpractice because the primary issues in most such cases are the standard of care, breach, and proximate cause, and both parties call on experts to testify. The trial court must insure, in its discretion, that questions seeking to elicit evidence of the witness's bias, prejudice, or interest and inconsistent prior testimony or statements are not unduly limited or improvidently extended. The trial judge must also be alert to questions which harass, intimidate, or belittle a witness.

2. That a substantial part of the expert's medical practice involves evaluating disabilities and reporting his findings and conclusions for cases which may come to court is a proper subject for general limited inquiry on cross-examination because his experience may influence the manner in which he testifies. It is thus proper to bring out on cross-examination the number of times an expert witness testifies in court, or is involved in particular types of cases. Evidence that the expert had testified in other malpractice cases at the request of plaintiffs' counsel is a permissible subject of cross-examination for the purpose of attacking credibility. A pattern of testimony for a particular attorney raises a possible inference that the

expert witness has testified in such a manner that he would be hired in future cases. In response, additional inquiry is permissible to show that the witness had been called by numerous other lawyers on various issues over the years.

3. A pattern of testimony as an expert witness for a particular category of plaintiffs or defendants may suggest bias, but is only minimally probative of bias, and should be carefully scrutinized by the trial court. In this case the trial court did not commit reversible error, nor abuse its discretion, by permitting the cross-examination to continue within limited bounds, until the expert testified that he could not recollect any involvement in two of the other cases. Furthermore, the plaintiffs did not object until after he had described his involvement in malpractice cases and had testified as to his relationship with plaintiffs' counsel.

4. The statement by defense counsel in closing argument about "professional witnesses", assuming that it was directed toward the plaintiffs' expert, was not a fair characterization of the witness. The evidence merely showed that he had been involved in a few medical malpractice cases, and there was no evidence that he frequently testified. Sixty percent of his income was from the care of patients. However, the failure of the trial court to give the requested instruction to the jury does not require reversal and a new trial in this case. The unfair reference to the expert was indirect. The request for the cautionary instruction was made after the plaintiffs' lawyer had responded to the statement in his argument, and the trial court did instruct the jury that statements in closing argument are not evidence.

5. The conduct of defense counsel in cross-examining the expert and in arguing improperly to the jury did not deprive the plaintiffs of a fair trial under the circumstances of this case. It was not the type of egregious and repetitive conduct which requires a new trial. The record reflects no studied purpose to prejudice the jury. The cross-examination did not harass or belittle the witness. There were no accusations of lying. After the trial court sustained the plaintiffs' objection, the questioning stopped, and there was only one indirect improper comment in the argument to the jury.

6. The mere occurrence of the infection in Mr. Wilson's arm and the showing that the defendant hospital had a rate of postoperative infections well below the national average are not sufficient, under the doctrine of *res ipsa loquitur,* to establish an issue of the hospital's negligence for the jury to consider. Only when it is shown that the event is of the kind which

ordinarily does not occur in the absence of negligence is the burden placed upon the defendants to explain their conduct. The mere occurrence of a post-operative infection does not give rise to an inference of negligence when no more is shown than that an infection has occurred and that an infection is rare.

7. The argument that Dr. Stilwill was an agent of the hospital by estoppel is without merit. There was an independent physician-patient relationship prior to the treatment at the hospital, and the jury's verdict for defendant Stilwill prevents the imposition of liability on the hospital for Dr. Stilwill's actions. The only possible liability of the hospital would be if its ostensible agents or employees negligently failed to prevent the infection. Since the question of negligence concerning the infection was properly withdrawn from the consideration of the jury, it was also proper to withdraw any claim based on the doctrine of agency by estoppel.

8. Whether the hospital was negligent in failing to establish standards for care of patients which would require someone qualified to remain after surgery to ascertain if an infection would develop when the possibility was known or should have been known is not an issue which can be determined by common knowledge and experience of a jury, but raises a question of medical judgment. The plaintiffs failed to introduce any expert testimony to establish the standard of conduct. Review in the light most favorable to the plaintiffs of the testimony and the reasonable inferences from it shows that the trial judge properly granted a directed verdict for the defendant hospital.

The judgment of the Court of Appeals is affirmed.

Justice Levin, joined by Justices Kavanagh and Williams, dissenting, would reverse and remand for a new trial.

1. An expert's history as a witness for other litigants is not probative of interest or bias. Even if such a history has a modicum of probative value on the issue of credibility, inquiries of that sort should ordinarily be prohibited because of their potential for distracting the jury or creating collateral issues, as this case demonstrates.

2. The interaction of the rule in medical malpractice cases requiring that a violation of the standard of care be proved by expert testimony, the understandable reluctance of physicians to testify against other physicians, and the Court's decision in this case, produces a dilemma for injured plaintiffs. If they succeed in obtaining expert testimony, they face the prospect of having their witnesses belittled and their cases undermined by questions intended to insinuate that those physicians who do

testify are habitual accusers motivated by avarice or vengeance. Fairness requires that the plaintiff's expert witnesses not be impugned simply because they have testified for plaintiffs in other cases. It is sufficient that the defendant be permitted to show that the witness has received a fee for his services.

3. The suggestion by defense counsel in closing argument that the plaintiffs had employed "professional witnesses" magnified the error introduced by the earlier line of questioning. It cannot be said with assurance that the combination of questioning and argument which injected a false issue in this case did not deny the plaintiffs a fair trial. Even if it is fair comment to label an expert who derives all or the great bulk of his income from giving testimony and the attendant preparation a "professional witness", Dr. Badgley, who testified that he derives 60% of his income from caring for patients, cannot fairly be characterized as a "professional witness".

4. The inquiry regarding the number of times an expert witness has testified for other plaintiffs should generally be excluded because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Adoption of a rule generally barring such inquiry would be to do no more for the plaintiff in a medical malpractice case than has been done for defendants by the Michigan Rules of Evidence where relevant evidence, *e.g.,* subsequent remedial measures, offers of compromise, payment of medical expenses, and liability insurance, has been generally barred to protect the rights of defendants to a fair trial.

5. The defendant should not be permitted to exploit unfairly the rule requiring, for the defendant's protection, expert testimony, and the reluctance of physicians to testify against another member of their profession. However, if the objected-to inquiry is permissible, then plaintiffs should be able to respond with expert testimony and other evidence tending to show the difficulty of obtaining expert medical testimony on behalf of a plaintiff. If the defendant can charge the plaintiff with offering manufactured testimony, the plaintiff should be able to show why a physician who is willing to testify for a plaintiff may be called upon to do so with some frequency.

92 Mich App 227; 284 NW2d 773 (1979) affirmed.

OPINION OF THE COURT

1. WITNESSES — CROSS-EXAMINATION — DISCRETION.

The scope and duration of cross-examination of witnesses rests in

the sound discretion of the trial court; the exercise of that discretion will not be reversed absent a clear showing of abuse.

2. WITNESSES — CROSS-EXAMINATION — DISCRETION.

The trial court must insure, in its discretion, that questions on cross-examination seeking to elicit evidence of the witness's bias, prejudice, or interest and inconsistent prior testimony or statements are not unduly limited or improvidently extended; the trial court must also be alert to questions which harass, intimidate, or belittle a witness.

3. WITNESSES — EXPERT WITNESSES — CROSS-EXAMINATION.

That a substantial part of the medical practice of an expert witness in a trial for medical malpractice involves evaluating disabilities and reporting his findings and conclusions for cases which may come to court is a proper subject for general limited inquiry on cross-examination; it is also proper to bring out on cross-examination the number of times an expert witness testifies in court, or is involved in particular types of cases.

4. WITNESSES — EXPERT WITNESSES — CROSS-EXAMINATION.

Evidence that an expert witness in a trial for medical malpractice had testified at the request of the plaintiffs' counsel in other malpractice cases is a permissible subject of cross-examination, in the trial court's discretion, for the purpose of affecting his credibility by raising a possible inference that the witness has testified in such a manner that he would be hired in future cases; in response, additional inquiry would be permissible to show that the witness had also been called by many other lawyers to testify on various issues over the years.

5. WITNESSES — EXPERT WITNESSES — IMPEACHMENT — BIAS.

A pattern of testifying as an expert witness for a particular category of plaintiffs or defendants is only minimally probative of bias, and impeachment by such evidence should be carefully scrutinized by the trial court.

6. WITNESSES — EXPERT WITNESSES — CROSS-EXAMINATION — PHYSI-CIANS AND SURGEONS — MALPRACTICE.

Permitting cross-examination of an expert medical witness as to his pattern of testifying for plaintiffs in actions for medical malpractice was not reversible error where the trial court limited the cross-examination by sustaining an objection after the witness testified that he could not recollect any involvement in two cases in which plaintiffs' counsel was apparently not involved.

7. WITNESSES — ARGUMENT OF COUNSEL — IMPROPER COMMENT —
INSTRUCTIONS TO JURY — EXPERT WITNESSES.

Failure in a trial for medical malpractice to give a special
instruction to the jury to disregard an unfair remark by de-
fense counsel in closing argument about the use of "profes-
sional witnesses" does not require reversal of the verdict of no
cause of action and a new trial where the unfair reference to
the plaintiffs' expert witness was indirect, the request for the
cautionary instruction was made after the plaintiffs' lawyer
had responded to the statement in his argument, and the trial
court did instruct the jury that statements of counsel made in
argument are not in evidence.

8. WITNESSES — ARGUMENT OF COUNSEL — IMPROPER COMMENT —
EXPERT WITNESSES.

The conduct of counsel for a defendant physician in cross-examin-
ing the plaintiffs' expert medical witness as to his pattern of
involvement in actions for medical malpractice and in unfairly
arguing to the jury about the use of "professional witnesses"
did not deprive the plaintiffs of a fair trial for medical malprac-
tice where the attorney's conduct was not egregious and repeti-
tive, the record reflects no studied purpose to prejudice the
jury, the cross-examination did not harass or belittle the wit-
ness, there were no accusations of lying, after the trial court
sustained the plaintiffs' objection the questioning stopped, and
there was only one indirect improper comment in defense
counsel's argument.

9. HOSPITALS — MALPRACTICE — NEGLIGENCE — INFERENCES — POST-
OPERATIVE INFECTION.

The mere occurrence of a post-operative infection and a showing
that a defendant hospital had a rate of post-operative infection
well below the national average are not sufficient, under the
doctrine of *res ipsa loquitur,* to establish an issue for the jury of
the hospital's negligence in an action for medical malpractice.

10. HOSPITALS — MALPRACTICE — PHYSICIANS AND SURGEONS — VI-
CARIOUS LIABILITY — AGENCY — ESTOPPEL.

A claim against a defendant hospital of medical malpractice
based on the doctrine of agency by estoppel was without merit
where there was an independent relation between the defen-
dant physician and the plaintiff patient before the treatment by
the physician in the hospital and its operating room which
allegedly resulted in plaintiff's post-operative injury, there was
a verdict of no cause of action for the defendant physician,
there was no testimony that the hospital's operating room or

its surgical materials were unclean, the only possible liability of the hospital would be if its ostensible agents or employees failed to prevent a post-operative infection, and the question of negligence in failing to prevent a post-operative infection was properly withdrawn from consideration by the jury.

11. HOSPITALS — MALPRACTICE — PHYSICIANS AND SURGEONS — STANDARD OF CARE — WITNESSES — EXPERT WITNESSES.

A directed verdict of no cause of action for a defendant hospital was proper in an action for medical malpractice on a theory that the hospital negligently failed to establish standards for the care of patients after surgery where the plaintiffs failed to introduce any expert testimony to establish the standard of conduct; the issue presented is not within the common knowledge and experience of a jury, but raises a question of medical judgment which, as a general rule, requires expert testimony.

DISSENTING OPINION BY LEVIN, J.

12. WITNESSES — EXPERT WITNESSES — CROSS-EXAMINATION.

An expert's history as a witness for other litigants is not probative of interest or bias, and even if it has a modicum of probative value on the issue of credibility, inquiries of that sort should ordinarily be prohibited because of their potential for distracting the jury or creating collateral issues about the use of "professional witnesses".

13. WITNESSES — EXPERT WITNESSES — CROSS-EXAMINATION — PHYSICIANS AND SURGEONS — MALPRACTICE.

Defendant's counsel in actions for medical malpractice should not be permitted to turn the practical difficulties that plaintiffs encounter in obtaining expert testimony to the defendant's advantage by questions intended to insinuate that those physicians who do testify are habitual accusers motivated by avarice or vengeance.

14. WITNESSES — EXPERT WITNESSES — CROSS-EXAMINATION — PHYSICIANS AND SURGEONS — MALPRACTICE.

The plaintiff's expert witnesses in an action for medical malpractice should not be impugned simply because they have testified for plaintiffs in other cases; it is sufficient that the defendant be permitted to show that a witness has received a fee for his services.

15. WITNESSES — ARGUMENT OF COUNSEL — IMPROPER COMMENT — EXPERT WITNESSES.

Cross-examining the plaintiffs' expert medical witness as to his

*pattern of involvement in actions for medical malpractice and unfairly arguing to the jury about the use of "professional witnesses" cannot be said with assurance not to have denied the plaintiffs a fair trial in an action for medical malpractice.*

16. WITNESSES — ARGUMENT OF COUNSEL — IMPROPER COMMENT — EXPERT WITNESSES.

*An expert medical witness who testified that he derived 60% of his income from caring for patients cannot fairly be characterized by counsel in arguing to the jury as a "professional witness", even if it is fair comment to label an expert who derives all or the great bulk of his income from giving testimony and the attendant preparation a "professional witness".*

17. WITNESSES — EXPERT WITNESSES — CROSS-EXAMINATION.

*Inquiry regarding the number of times an expert witness has testified for other plaintiffs should generally be excluded because its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury (MRE 403).*

*Reid, Reid, Mackay, Emery & DeVine, P.C.,* for plaintiffs.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *Everett R. Trebilcock, Eugene F. Townsend* and *C. Mark Hoover),* for defendant Stilwill.

*Kitch, Suhrheinrich, Smith, Saurbier & Drutchas, P.C.* (by *David L. Moffitt),* for defendant Edward W. Sparrow Hospital Association.

BLAIR MOODY, JR., J. Plaintiffs in this medical malpractice case appeal from a jury verdict of no cause of action for the defendant George D. Stilwill, M.D., and a directed verdict for the defendant Edward W. Sparrow Hospital Association. Three issues are raised by the plaintiffs on appeal:

(1) Whether the trial court committed reversible error by permitting the plaintiffs' expert witness to be cross-examined about his involvement in other medical malpractice cases.

(2) Whether the remarks during closing argument by counsel for the defendant doctor indicating that his client did not utilize "professional witnesses" deprived plaintiffs of a fair trial and required a new trial.

(3) Whether the trial court committed reversible error by granting the defendant hospital's motion for a directed verdict.

The Court of Appeals answered these questions in the negative and affirmed the jury verdict and the directed verdict. We agree, although in part for different reasons. Accordingly, we affirm the judgment of the Court of Appeals.

## I. Facts

The plaintiff, Irving J. Wilson, experienced some problems and difficulty with his right arm. In November, 1970, he contacted the defendant Dr. Stilwill, an orthopedic surgeon. Dr. Stilwill diagnosed the problem to be the result of a non-union of an old fracture. Dr. Stilwill advised Mr. Wilson that he could perform a compression-plating procedure by which the non-union could be corrected.

Surgery was performed on December 11, 1970, at the defendant Edward W. Sparrow Hospital. Following surgery Mr. Wilson experienced difficulty moving the fingers of his right hand. Signs of infection developed. Five days after the operation culture and sensitivity tests were ordered by Dr. Stilwill. The infection was identified and treated with antibiotics. Following his release from Sparrow Hospital, Mr. Wilson complained of pain, swelling, and a discharge from his arm. Additional tests indicated the presence of different bacteria. Subsequently, a number of additional surgical pro-

cedures were performed at the hospital. Mr. Wilson's right arm is now paralyzed.

Mr. and Mrs. Wilson brought this action against Dr. Stilwill and Edward W. Sparrow Hospital for malpractice. At the close of the plaintiffs' proofs the trial court directed a verdict for the hospital. The jury returned a verdict of no cause of action for the defendant Dr. Stilwill. The trial court denied the plaintiffs' motion for new trial. The Court of Appeals affirmed. 92 Mich App 227; 284 NW2d 773 (1979). We granted leave to appeal. 408 Mich 898 (1980).

## II. CROSS-EXAMINATION

The first issue pertains to a line of questioning on cross-examination directed to the plaintiffs' expert witness, W. O. Badgley, M.D., by counsel for the defendant Dr. Stilwill. Responding to inquiries as to whether he was still actively treating patients, Dr. Badgley testified that 40% of his practice had to do with disability evaluation. He stated: "Sixty percent comes from the care of patients." The doctor explained that attorneys referred patients to him for disability evaluation and reports as to the extent of their injuries. Dr. Badgley confirmed the fact that he gives testimony or his opinions concerning the evaluations. He also testified that he had not been involved in more than two or three cases in which there was alleged malpractice. In two cases the attorney for the plaintiffs was the same attorney representing the plaintiffs in the instant case. When questioned about a third malpractice case, Dr. Badgley stated that he did not recall that case and that he had never testified.

At that point, plaintiffs' counsel objected. The trial court permitted the questioning to continue.

Dr. Badgley then recalled that he had been asked his opinion on that case, but that he had nothing to do with the case. After he testified that he had no recollection of two other cases, the plaintiffs' attorney again objected. The objection was sustained. There was no motion to strike any testimony, nor any request for a curative or limiting instruction.

The plaintiffs contend that the trial court erred when it initially overruled the objections of plaintiffs' counsel and that in any event the evidence introduced deprived the plaintiffs of a fair trial. It is the claim of the plaintiffs that the cross-examination of Dr. Badgley was calculated to convey to the jury the innuendo that there was complicity between the expert witness and the plaintiffs' attorney. Plaintiffs urge that this line of questioning was intended to improperly divert the attention of the jury from the issues of malpractice and to focus upon the credibility of the witness in an effort to prejudice the jury.

In response, the defendant doctor asserts that the scope of cross-examination is subject to the trial court's discretion. In this case, defense counsel was attempting to impeach the expert witness by showing that he was involved in more than two or three malpractice cases. Furthermore, the inquiry was also designed, within proper bounds, to elicit testimony indicative of bias or prejudice. Defense counsel sought to establish that Dr. Badgley had previously testified in malpractice suits at the request of plaintiffs' attorney and that the witness had almost always been involved in cases on behalf of a plaintiff. This background information, defendant urges, is appropriate for the jury to evaluate in weighing the import of the expert opinion.

The scope and duration of cross-examination of witnesses rests in the sound discretion of the trial court. The exercise of this discretion will not be reversed absent a clear showing of abuse. See, *e.g., People v Taylor,* 386 Mich 204; 191 NW2d 310 (1971). See also *Hayes v Coleman,* 338 Mich 371; 61 NW2d 634 (1954) (broad scope of cross-examination to show bias or prejudice). There is "a general canon that on cross-examination the *range* of evidence that may be elicited for any purpose of discrediting is to be *very liberal".* 3A Wigmore, Evidence (Chadbourn Rev), § 944, p 778.

The primary issues in most medical malpractice cases are: what is the appropriate standard of care, whether there was a breach of this standard of care and whether the breach was a proximate cause of plaintiff's injuries. Both parties in most cases call upon expert witnesses to testify on these issues. In this "battle of experts" credibility is a primary question for consideration by the jury.

The trial judge is charged with the responsibility, in his or her discretion, of permitting and limiting attacks on credibility. He or she must insure that questions seeking to elicit evidence indicating bias, prejudice or interest and inconsistent testimony or statements are not unduly limited or improvidently extended. The trial judge also must be alert to questions which harass, intimidate or belittle a witness.

The fact that a substantial part of Dr. Badgley's practice involves giving disability evaluations and preparing reports of his findings and conclusions is not an improper subject for general limited inquiry. An expert witness's experience testifying in court may influence the manner in which he or she testifies. The same is true for experience in evaluating cases which may come to court. It is

thus proper to bring out on cross-examination the number of times a witness testifies in court, or is involved in particular types of cases. See *Rumptz v Leahey,* 26 Mich App 438; 182 NW2d 614 (1970).

In *DeHaan v Winter,* 262 Mich 192; 247 NW 151 (1933), *(After Remand)* 265 Mich 101; 251 NW 391 (1933), our Court held that permitting cross-examination of an expert witness concerning his interest in the event of suit was not error. *DeHaan* is a medical malpractice case. The expert medical witness and the defendant doctor belonged to the state medical society. A small portion of the society's dues went to the defense of malpractice suits for members.

"For the purpose of affecting credibility of the witness, he may be cross-examined as to his interest in the event of suit, including contribution to the expense of it." *DeHaan,* 262 Mich 195.

Evidence concerning the fact that Dr. Badgley had testified at the request of the plaintiffs' counsel in other malpractice cases, like the testimony in *DeHaan,* is a permissible subject of cross-examination for the purpose of affecting credibility. The cross-examination of Dr. Badgley minimally concerned possible bias or prejudice. See *Ager v Baltimore Transit Co,* 213 Md 414; 132 A2d 469 (1957). A showing of a pattern of testimony for a particular attorney in past cases raises a possible inference that the witness has testified in such a manner that he would be hired in future cases.[1] See

---

[1] This Court does not suggest that Dr. Badgley's testimony has ever been influenced by his relationship with the plaintiffs' counsel. The Court's close analysis of the transcript reveals Dr. Badgley to be a concerned and dedicated physician. Furthermore, we recognize that expert witnesses, particularly in medical malpractice cases, furnish testimony that is essential to the truth-seeking trial process. Nevertheless, when permitted by the trial court, the jury may evaluate

*Collins v Wayne Corp,* 621 F2d 777, 784 (CA 5, 1980). See also *Treece v The Greyhound Bus Co,* 63 Mich App 63, 66; 234 NW2d 404 (1975); *Gutowski v M & R Plastics & Coating, Inc,* 60 Mich App 499, 505, fn 2; 231 NW2d 456 (1975). In response, additional inquiry would be permissible to show that the witness had been called by many other lawyers on various issues over the years. The jury, in the trial court's discretion, may hear and evaluate evidence affecting credibility.

Counsel for the plaintiffs first raised an objection to the cross-examination when questions were raised concerning Dr. Badgley's involvement in malpractice cases as a witness for the injured party where it did not appear that plaintiffs' counsel was involved. The trial court initially permitted the questioning to continue. When Dr. Badgley could not recollect any involvement in two cases, plaintiffs' counsel objected and the objection was sustained.

A pattern of testifying as an expert witness for a particular category of plaintiffs or defendants may suggest bias.[2] However, such testimony is only minimally probative of bias and should be carefully scrutinized by the trial court.[3]

such relationships and "dedication cannot insulate anyone from the suggestions of bias that a cross-examiner brings out when he plays his role in a trial". *Collins v Wayne Corp,* 621 F2d 777, 784, fn 5 (CA 5, 1980).

[2] 3 Kramer, Medical Malpractice (New York: Matthew Bender, 1980), ¶ 29.08, pp 29-76 to 29-77. See also Graham, *Impeaching the Professional Expert Witness by a Showing of Financial Interest,* 53 Ind L J 35 (1977).

Attorneys representing injured persons advocate cross-examining a defendant's expert witness concerning the frequency of testifying in previous medical malpractice cases. See Kramer, *Cross-Examination of the Medical Expert,* 13 Trial 26, 27 (Dec, 1977).

[3] The Michigan Rules of Evidence, adopted after the trial in the instant case, confer reasonable discretion upon the trial judge to admit or exclude evidence and to control the cross-examination of witnesses. This discretion includes, *inter alia,* decisions to permit

In the instant case the trial court did not commit reversible error, nor abuse its discretion, by permitting the cross-examination covering these areas of inquiry to continue within limited bounds. Furthermore, an objection was not raised until after Dr. Badgley had described his involvement in malpractice cases and had testified as to his relationship with the plaintiffs' counsel.

### III. Closing Argument

Plaintiffs contend that their expert, Dr. Badgley, was characterized as a "professional witness" by counsel for Dr. Stilwill in his closing argument and that this statement denied plaintiffs a fair trial. In his closing argument defendant Dr. Stilwill's counsel stated:

"In an attempt, ladies and gentlemen, to find out the most probable cause of Mr. Wilson's injury we went to the two largest at least [sic] medical institutions in the State of Michigan. We went to the University of Michigan and we went to Henry Ford Hospital. And we got there, and we went to the sub-department of internal medicine, the medical practice of infectious diseases.

---

questions concerning a witness's history of testifying in court and the problems, if any, in securing the necessary expert testimony.

MRE 403 supplies sufficient guidance:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

MRE 611 provides in part:

"(a) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

"(b) Scope of cross-examination. A witness may be cross-examined on any matter relevant to any issue in the case, including credibility."

We did not go to professional witnesses; we went to professional physicians qualified better than any other man *[sic]* in the State of Michigan, to the best of our knowledge, to determine the answers to the questions. What caused the infection; and, secondly, could the infection work so fast as to cause paralysis in Mr. Wilson's hand which was evidenced by the time he regained full consciousness? We gave them all of the facts, and in Cox's [one of the defendant doctor's experts] hypothetical we used facts most favorable to the plaintiff, and he said there was no evidence of malpractice."

In his rebuttal argument plaintiffs' counsel stated:

"[A]s a matter of fact, when you go into the jury room, if there is any inference that [Dr. Badgley] is a bad person for coming in here and testifying, there is a bill in here from Dr. Badgley; he examined the man [in] November of 1975, and it is Exhibit No. 24, and he charged $100.20. I asked him about that. Do you really think that Dr. Badgley came in here and testified for $100.20?

\* \* \*

"I think you should settle back and listen to what he said, not try to talk about professional witnesses and the like because it is unfair, unjust to my client to say that."

When the jury was excused after closing arguments, counsel for the plaintiffs requested the trial court to instruct the jury to disregard defense counsel's "professional witness" statement or, in the alternative, to give a cautionary instruction.

Defendant doctor's counsel attempted to explain that his comment did not refer to Dr. Badgley, plaintiffs' expert witness. It was argued that the statement about professional witnesses was based upon defense counsel's concern about any unfavor-

able inference that the experts called by the defendant doctor were professional witnesses because these expert witnesses were not from the immediate area.

The trial court did not recall any specific reference to Dr. Badgley, and even if there was, the trial court indicated the statement might have constituted fair comment under all the circumstances of the case. The trial court denied the request for a special instruction. The trial court's instructions to the jury did include, however, the general instruction that arguments, statements and remarks of attorneys are not evidence and that the jury should disregard anything said by an attorney which is not supported by evidence.

The Court of Appeals agreed with the trial court's ruling and concluded that even if the statement was directed toward plaintiffs' expert, the statement was a reasonable inference from the testimony and amounted to a fair characterization of the witness. The Court of Appeals opinion referred to the testimony of plaintiffs' expert that approximately 40% of his income was derived from the evaluation of medical disability cases and that he had been involved in a number of medical malpractice cases.

We do not agree with the conclusion that the "professional witness" statement, assuming it was directed toward Dr. Badgley, was a fair characterization of the witness. The evidence merely showed that Dr. Badgley had been involved in a few medical malpractice cases. There was no evidence indicating that the doctor frequently testified. Furthermore, Dr. Badgley derived 60% of his income from the care of patients.

However, the failure of the trial court to give the requested instruction does not require reversal

and a new trial in this case.[4] The reference to Dr. Badgley was indirect. The request for an instruction was made after the plaintiffs' lawyer had responded to the statement in his rebuttal argument. The trial court did instruct the jury that statements in closing argument are not evidence. Furthermore, the conduct of the defendant doctor's counsel in questioning Dr. Badgley and in arguing to the jury did not deprive plaintiffs of a fair trial under the circumstances of this case.

This Court has not hesitated to require a new trial when attorneys, through questioning and argument, have shown a studied purpose to prejudice the jury.

In *Wayne County Board of Road Comm'rs v GLS LeasCo,* 394 Mich 126, 139; 229 NW2d 797 (1975), this Court ordered a new trial because the board's attorney repeatedly belittled and harassed witnesses and opposing counsel even after objections were sustained. Witnesses were accused of lying and of fabricating evidence. The board's lawyer suggested that opposing counsel and LeasCo executives "bought" testimony.

"A substantial doubt regarding the fairness of the trial has been raised by the egregious and repetitive nature of the misconduct of the board's lawyer."

In *Kern v St Luke's Hospital Ass'n of Saginaw,* 404 Mich 339, 354; 273 NW2d 75 (1978), counsel for the defendants

"continuously raised the groundless charge, by direct attack and innuendo, that the 'bought' testimony of plaintiffs' out-of-state expert witnesses was collusive and untrue."

---

[4] GCR 1963, 529.1.

Defense counsel in *Kern* improperly and repeatedly attempted to show a conspiracy to render false testimony. Defense counsel referred to one of plaintiffs' experts as " 'the fellow that came in here to do my client in' ". *Kern,* 351. The conduct of defense counsel in *Kern* was perceived as "a studied purpose to prejudice the jury". *Kern,* 354.

The conduct of the attorney for the defendant doctor in the instant case was not the type of egregious and repetitive conduct that was present in *LeasCo* and *Kern.* The record reflects no studied purpose to prejudice the jury. The questioning on cross-examination of Dr. Badgley did not harass or belittle the witness. There were no accusations of lying. After the trial court sustained the objection by plaintiffs' attorney, the questioning stopped. There was only a single and indirect improper comment in closing argument.

We therefore conclude that neither the questioning on cross-examination of Dr. Badgley, nor the closing argument of the defendant doctor's counsel warrant setting aside the jury's verdict in this case.

## IV. DIRECTED VERDICT

### A

At the close of the plaintiffs' proofs the trial court directed a verdict for the defendant hospital. Plaintiffs contend that the case should have been submitted to the jury under the doctrine of *res ipsa loquitur,* as the mere occurrence of the infection in Mr. Wilson's arm is sufficient to establish an issue for the jury to consider.

Plaintiffs rely upon four conditions for the application of *res ipsa loquitur* set forth in *Gadde v*

*Michigan Consolidated Gas Co,* 377 Mich 117, 124; 139 NW2d 722 (1966):[5]

"1. The event must be of a kind which ordinarily does not occur in the absence of someone's negligence.

"2. The event must have been caused by an agency or instrumentality within the exclusive control of the defendant.

"3. The event must not have been due to any voluntary action or contribution on the part of the plaintiff.

"4. Evidence of the true explanation of the event must be more readily accessible to the defendant than to the plaintiff." (Emphasis deleted.)

The Court of Appeals, relying upon another infection case, *Rohdy v James Decker Munson Hospital,* 17 Mich App 561; 170 NW2d 67 (1969), *lv den* 383 Mich 756 (1969), rejected the plaintiffs' argument. We agree with the Court of Appeals.

The threshold question with respect to this issue is whether an infection ordinarily does not occur in the absence of negligence.

The testimony showed that the defendant hospital had a post-operative infection rate well below the national average. At least three physicians who testified indicated that infections which are not the result of any breach of due care can and do occur during surgery. There was no testimony to the contrary. Plaintiffs' expert witness described proper sterilization procedures which were consistent with the testimony given for the defendants. Furthermore, there was no testimony suggesting a break in sterile technique.

The plaintiffs suggest that the low incidence of

---

[5] Michigan has not formally adopted the doctrine of *res ipsa loquitur.* However, the underlying concepts of *res ipsa loquitur,* which are circumstantial evidence and negligence concepts, have been applied in Michigan. *Gadde v Michigan Consolidated Gas Co,* 377 Mich 117; 139 NW2d 722 (1966).

infection at the defendant hospital means that infection does not ordinarily occur. From this statement they seek to apply *res ipsa loquitur.* Although it is true that statistically infections did not ordinarily occur at the defendant hospital, this fact does not suggest that when an infection does occur, it is the result of negligence.

"The requirement that the occurrence be one which ordinarily does not happen without negligence is of course only another way of stating an obvious principle of circumstantial evidence: that the event must be such that in the light of ordinary experience it gives rise to an inference that some one must have been negligent.

* * *

"In the usual case the basis of past experience from which the conclusion may be drawn that such events usually do not occur without negligence is one common to the whole community, upon which the jury are simply permitted to rely. Even where such a basis of common knowledge is lacking, however, expert testimony may provide a sufficient foundation; and by the same token it may destroy an inference which would otherwise arise." Prosser, Torts (4th ed), § 39, pp 214, 217.

The mere occurrence of a post-operative infection is not a situation which gives rise to an inference of negligence when no more has been shown than the facts that an infection has occurred and that an infection is rare. See, *e.g., Shurpit v Brah,* 30 Wis 2d 388; 141 NW2d 266 (1966); *McCall v St Joseph's Hospital,* 184 Neb 1; 165 NW2d 85 (1969); *Contreras v St Luke's Hospital,* 78 Cal App 3d 919; 144 Cal Rptr 647 (1978).

Since we have determined that plaintiffs have not met the threshold requirement for an inference of negligence, their reliance upon *Ybarra v Spangard,* 25 Cal 2d 486; 154 P2d 687 (1944), as

authority for placing the burden upon the defendants to explain their conduct is inapposite. The *Ybarra* court concluded that the event must be of the kind which ordinarily does not occur in the absence of negligence. Only when this initial point is shown would the burden be placed upon the defendants to explain their conduct.

## B

The plaintiffs also contend that the trial court erred by directing a verdict for the hospital because they were prevented from arguing agency by estoppel as set forth in *Howard v Park,* 37 Mich App 496; 195 NW2d 39 (1972), *lv den* 387 Mich 782 (1972). The Court of Appeals did not address this issue. The defendant hospital argues that this issue was not preserved for appeal.

The plaintiffs' complaint alleged that the hospital, through its agents and employees, allowed the operating room and the materials used during surgery to be unclean, which caused the post-operative infection. In the Court of Appeals the plaintiffs argued that Dr. Stilwill was an agent by estoppel of the hospital. Even if properly preserved, we conclude that the issue is without merit.

In *Grewe v Mount Clemens General Hospital,* 404 Mich 240; 273 NW2d 429 (1978), we held that, under the doctrine of agency by estoppel, or ostensible agency, a hospital may be held liable for the acts of medical personnel who were its ostensible agents although the named defendant physician is not found liable. In *Grewe,* as in *Howard v Park,* the plaintiff looked to the hospital for treatment of his physical ailments and did not merely view the hospital as the situs where his physician would treat him. In neither of these cases did the plain-

tiffs have an independent relationship with the allegedly negligent physician prior to admission to the hospital.

In the instant case there was an independent physician-patient relationship prior to the hospital treatment. Furthermore, as to the claim that Dr. Stilwill was an agent of the hospital, the jury's determination of no cause of action for defendant Dr. Stilwill prevents imposing liability upon the hospital for Dr. Stilwill's actions. See *Lamb v Oakwood Hospital Corp,* 41 Mich App 287; 200 NW2d 88 (1972).

We have determined that the mere occurrence of the post-operative infection is insufficient to establish an issue for consideration by the jury. There is no testimony to indicate that the operating room or surgical materials were unclean. The only possibility for imposing liability upon the hospital would be if one or more of its ostensible agents or employees acted negligently by failing to prevent the infection. Since the question of negligence concerning the infection was properly withdrawn by the trial court from consideration by the jury, it was also proper to withdraw any claim based upon the doctrine of agency by estoppel.

C

The plaintiffs further argue that the jury should have been permitted to consider their claim that the hospital was negligent by failing to establish standards of conduct which would have required doctors or other qualified personnel to remain in attendance on Mr. Wilson after surgery to ascertain if an infection would develop, when they knew or should have known of the possibility. The trial court directed a verdict on this claim for the hospital because the plaintiffs failed to introduce

any expert testimony to establish the standard of conduct.

The plaintiffs contend that this case presents a question of ordinary negligence and that no expert testimony was necessary. With respect to this assertion, it seems evident that whether a hospital's negligence must be shown by expert testimony depends on the circumstances of the particular case. The plaintiffs rely on two cases in support of their theory. *Fogel v Sinai Hospital of Detroit,* 2 Mich App 99; 138 NW2d 503 (1965), clearly involved a case of ordinary negligence. Fogel had warned a nurse's aide that one aide was not capable alone of helping her get to the bathroom. The aide could not hold her and she fell and fractured her hip. *Gold v Sinai Hospital of Detroit, Inc,* 5 Mich App 368; 146 NW2d 723 (1966), also held that a patient's fall in a hospital was a matter of ordinary negligence. However, these cases presented issues which are within the common knowledge and experience of a jury.

In contrast to *Fogel* and *Gold,* the instant case presents a standard of conduct issue which cannot be determined by common knowledge and experience, but rather raises a question of medical judgment. If questions regarding this standard were presented in a malpractice case involving a physician or dentist, expert testimony would be required to establish the standard. See, *e.g., Lince v Monson,* 363 Mich 135; 108 NW2d 845 (1961); *Roberts v Young,* 369 Mich 133; 119 NW2d 627 (1963); *Wrobel v Cotman,* 372 Mich 383; 126 NW2d 723 (1964). Similarly, when a medical malpractice action not involving ordinary negligence is brought against a hospital, as a general rule, expert testimony is required. See, *e.g., Bivens v Detroit Osteopathic Hospital,* 77 Mich App 478;

258 NW2d 527 (1977), *rev'd on other grounds* 403 Mich 820 (1978); *Brandon v Art Centre Hospital (Osteopathic)*, 366 F2d 369 (CA 6, 1966).

We have reviewed the testimony in the light most favorable to the plaintiffs and have drawn the reasonable inferences therefrom which are in their favor. *Dodd v Secretary of State*, 390 Mich 606, 612; 213 NW2d 109 (1973). We conclude that the trial judge properly granted the directed verdict for the hospital.

The trial judge did not commit reversible error. The plaintiffs were not denied a fair trial.

Accordingly, we affirm the judgment of the Court of Appeals. Costs to the defendants.

COLEMAN, C.J., and FITZGERALD and RYAN, JJ., concurred with BLAIR MOODY, JR., J.

LEVIN, J. *(dissenting)*. Plaintiffs' expert witness at trial was Dr. W. O. Badgley, an orthopedic surgeon who had long been on the staff at Sparrow Hospital.

On cross-examination, Badgley testified that he derived 40% of his income from disability evaluations and 60% from the care of patients. Defense counsel inquired whether Badgley was "frequently referred patients such as Mr. Wilson by attorneys such as Mr. Mackay", and, when Badgley responded that he had not been involved "in more than two or three cases in which there was suspected malpractice", asked whether he had been involved in a number of specific cases, including two handled by the same plaintiffs' attorney. Plaintiffs' relevancy objection was at first overruled but was ultimately sustained.

During closing argument, the lawyer for defendant Dr. Stilwill said:

"In an attempt, ladies and gentlemen, to find out the most probable cause of Mr. Wilson's injury we went * * * to the University of Michigan and we went to Henry Ford Hospital. * * * We did not go to *professional witnesses;* we went to professional physicians qualified better than any other man *[sic]* in the State of Michigan, to the best of our knowledge, to determine the answers to the questions." (Emphasis supplied.)

Following oral argument, plaintiffs' lawyer requested a curative instruction. The judge denied the request, saying that although he had "discerned that that [reference to Dr. Badgley] was the implication" of the remarks, it was "not certain that they wouldn't have constituted fair comment under all of the circumstances".

I

The Court of Appeals said:

"In the present case no error was committed below by the elicitation from plaintiffs' expert testimony concerning his involvement in other malpractice cases. This testimony was probative on the question of weight to be given by the trier of fact."

The Court of Appeals relied on *Treece v Greyhound Bus Co,* 63 Mich App 63, 66; 234 NW2d 404 (1975), where the panel said without analysis that several questions posed to a physician witness about his relationship with plaintiffs' counsel, including the number of times he had testified for clients of the attorney, "were probative of the weight which should have been given to the doctor's testimony by the jury".

Limited research has disclosed disagreement among the few authorities which have addressed the propriety of cross-examining a physician called

as an expert witness about his appearance as a witness in other cases. The practice was approved "as tending to show bias and interest and thereby affecting the credibility of the witness" in *Lammert v Wells,* 321 Mo 952, 954; 13 SW2d 547, 548 (1929). See, also, *Ager v Baltimore Transit Co,* 213 Md 414; 132 A2d 469 (1957), *Russell v Young,* 452 SW2d 434 (Tex, 1970), and *Barrios v Davis,* 415 SW2d 714 (Tex Civ App, 1967). In *Murero v Reinhart Lumber Co,* 85 Cal App 385; 259 P 494 (1927), the court declared that evidence that a physician had frequently been called as an expert witness did not show or tend to show "his interest" but went on to observe that such evidence would have fortified the qualifications of the witness had the trial court not sustained an objection to the cross-examination. In *McNenar v New York, C & S L R Co,* 20 FRD 598 (WD Pa, 1957), the court excused a doctor from answering interrogatories which would have required him to state the number of cases in which he had made medical examinations for the purpose of testifying as a medical expert for other litigants represented either by McNenar's attorney or by other counsel, and the number of such cases in which he had given testimony. The court deemed such inquiry "far too broad and extensive, productive of collateral issues and obstructing the expeditious administration of justice".[1]

All the foregoing cases were personal injury actions, not medical malpractice suits.

This Court recognized "the practical difficulty in

---

[1] Compare *Zamsky v Pittsburgh Public Parking Authority,* 378 Pa 38; 105 A2d 335 (1954), holding that cross-examination, in condemnation proceedings, as to fees condemner's expert witness had received for services rendered in the acquisition of other property and as to expert's estimated future compensation from condemner, was prejudicial error.

obtaining experts to testify in malpractice cases" in deciding that authoritative medical texts could be used to cross-examine expert witnesses. *Jones v Bloom,* 388 Mich 98, 117; 200 NW2d 196 (1972).

An expert's history as witness, as distinguished from his professional experience or credentials, is not probative of interest or bias. Even if such history has a modicum of probative value on the issue of credibility, inquiries of this sort should ordinarily be prohibited because of their potential for distracting the jury or creating collateral issues, as this case demonstrates.

The significance of evidence that an expert witness has testified in other cases is particularly diminished where the witness testifies to the malpractice of a fellow physician. We should not permit defendants' counsel to turn the practical difficulties that plaintiffs' counsel encounter in obtaining expert testimony to establish a violation of the standard of care in medical malpractice cases —the understandable reluctance of physicians to testify against other physicians—to the defendants' advantage by questioning intended to insinuate that those physicians who do testify are habitual accusers motivated by avarice or vengeance.

The interaction of the rule requiring that a violation of the standard of care be proved by expert testimony, the reluctance of physicians to testify against other physicians, and the court's decision in the instant case produces a dilemma for injured plaintiffs. They may not be able to prove their cases without expert medical testimony; yet, if they succeed in obtaining testimony from one or more of the limited number of physicians willing to give such testimony, they face the prospect of having their witnesses belittled and their cases undermined.

Fairness to physicians requires the rule requiring expert testimony, but fairness to injured persons requires that the plaintiff's expert witnesses not be impugned simply because they have testified for plaintiffs in other cases.

It is sufficient that the defendant be permitted to show that the witness has received a fee for his services.

## II

Defense counsel's suggestion that the plaintiffs had employed "professional witnesses" magnified the error introduced by his earlier line of questioning. In *Kern v St Luke's Hospital Ass'n of Saginaw,* 404 Mich 339; 273 NW2d 75 (1978), this Court recognized that a defense strategy of portraying the physicians testifying for plaintiffs as "professional experts" whose testimony had been purchased was so prejudicial as to require a new trial. While counsel's injection of a false issue in this case was not so egregious or pervasive, we cannot say with assurance that the combination of questioning and argument did not deny plaintiffs a fair trial.

Even if it is fair comment to label one who admittedly derives all or the great bulk of his income from giving testimony and the attendant preparation a "professional witness", Dr. Badgley, who testified that he derived 60% of his income from caring for patients, cannot fairly be characterized as a "professional witness".

## III

All relevant evidence is not perforce admissible. The Rules of Evidence provide that relevant

evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury" (MRE 403). In the application of that principle a trial judge may exclude relevant evidence, and as a matter of discretion the judge who tried this case could have barred the objected-to inquiry in this case.

We would, for the reasons stated, exclude the inquiry in every case absent a showing, out of the presence of the jury, by the defendant that the integrity of the plaintiff's expert witness can be legitimately challenged on some basis other than his history of testifying for plaintiffs.

The Rules of Evidence reflect a number of instances where, in the particular application of the general principle set forth in MRE 403, relevant evidence is excluded as a matter of law so as not to prejudice the defense, *e.g.,* the rules excluding evidence of subsequent remedial measures (MRE 407), of compromise and offers to compromise (MRE 408), of payment of medical and similar expenses (MRE 409), and of liability insurance (MRE 411).

Adoption of a rule generally barring inquiry regarding the number of times a witness has testified for other plaintiffs would be to do no more for the plaintiff in a medical malpractice case than has been done for defendants generally in the situations referred to where relevant evidence has been barred to protect the rights of defendants to a fair trial.

To allow the defendant to challenge a plaintiff's expert witness simply because he testifies for plaintiffs with some frequency is to permit the defendant to exploit unfairly the rule requiring, for defendant's protection, expert testimony, and

the reluctance of physicians to testify against another member of their profession.

If the objected-to inquiry is permissible, then plaintiffs should be able to respond with expert testimony and other evidence tending to show the difficulty in obtaining expert medical testimony on behalf of a plaintiff. The defendant could of course respond. A collateral issue, to be sure, but if the defendant can charge the plaintiff with offering manufactured testimony, plaintiff should be able to show why it is that a physician willing to testify for a plaintiff may be called upon to do so with some frequency.

We would reverse and remand for a new trial.

KAVANAGH and WILLIAMS, JJ., concurred with LEVIN, J.