**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Maura D. Corrigan

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 30, 2004**

DENISE BRYANT, Personal Representative
of the Estate of Catherine Hunt, Deceased,

    Plaintiff-Appellee,

v                            Nos. 121723, 121724

OAKPOINTE VILLA NURSING CENTRE,

    Defendant-Appellant.
_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

In this case, plaintiff, Denise Bryant, personal representative of the estate of her deceased aunt, Catherine Hunt, alleges that defendant Oakpointe Villa Nursing Centre, Inc. (Oakpointe), is liable for the death of her aunt, who died from positional asphyxiation while in defendant's care. Plaintiff has alleged that defendant was negligent in four distinct ways: (1) by failing to provide "an accident-free environment" for her aunt; (2) by failing to train its Certified Evaluated Nursing Assistants (CENAs) to recognize and counter the risk of positional asphyxiation posed by bed rails; (3) by failing to take adequate corrective measures after finding Ms. Hunt

entangled in her bedding on the day before her asphyxiation; and (4) by failing to inspect plaintiff's bed arrangements to ensure "that the risk of positional asphyxia did not exist for plaintiff's decedent." We are required in this appeal to determine whether each claim sounds in medical malpractice or ordinary negligence.

Plaintiff's "accident-free environment" claim is one of strict liability; because medical malpractice requires proof of negligence, this claim is not legally cognizable. Moreover, under the standards set forth in *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26; 594 NW2d 455 (1999), plaintiff's failure-to-train and failure-to-inspect claims sound in medical malpractice. Plaintiff's claim that defendant failed to take action after its employees found Ms. Hunt entangled in her bedding on the day before her asphyxiation, however, sounds in ordinary negligence.

We reverse the judgment of the Court of Appeals and remand this case to the Wayne Circuit Court for proceedings on plaintiff's claim of ordinary negligence and, given the equities in this case, on her two medical malpractice claims as well.

I. BACKGROUND

Plaintiff's decedent, Catherine Hunt, was a resident

2

of Oakpointe.  She suffered from multi-infarct dementia[1] and diabetes, had suffered several strokes, and required twenty-four-hour-a-day care for all her needs, including locomotion, dressing, eating, toileting, and bathing.  Hunt's condition impaired her judgment and reasoning ability and, in turn, caused cerebral atrophy.  Hunt had no control over her locomotive skills and was prone to sliding about uncontrollably and, therefore, she was at risk for suffocation by "positional asphyxia."[2]

Because Hunt had no control over her locomotive skills, Dr. Donald Dreyfuss, defendant's medical director,

---

[1] According to Tabers Cyclopedic Medical Dictionary (2002), "dementia" constitutes

> progressive, irreversible decline in mental function, marked by memory impairment and, often, deficits in reasoning, judgment, abstract thought, registration, comprehension, learning, task execution, and use of language.  The cognitive impairments diminish a person's social, occupational, and intellectual abilities.

"Multi-infarct dementia" constitutes

> [d]ementia resulting from multiple small strokes. . . .  The cognitive deficits of multi-infarct dementia appear suddenly, in "step-wise" fashion.  The disease is . . . most common in patients with hypertension, diabetes mellitus, or other risk factors for generalized atherosclerosis.  Brain imaging in patients with this form of dementia shows multiple lacunar infarctions.  [*Id.*]

[2] "Positional asphyxia refers to suffocation that results when someone's position prevents them from breathing properly.  See <http://en.wikipedia.org/wiki/Positional_asphyxia> (accessed July 27, 2004).

3

authorized the use of various physical restraints. These included bed rails to keep Hunt from sliding out of the bed, as well as a restraining vest that kept her from moving her arms, thereby impeding her ability to slide. The authorized restraints also included wedges or bumper pads that were placed on the outer edge of the mattress to keep her from hurting herself by striking, or entangling herself in, the rails. The use of restraints of this sort is regulated by the state of Michigan to prevent overuse and excessive patient confinement, and must be authorized by a physician.[3]

Several persons cared for Hunt on a twenty-four-hour basis, including registered nurses, practical nurses, and nursing assistants (CENAs). On March 1, 1997, nursing assistants Monee Olds and Valerie Roundtree noticed that Hunt was lying in her bed very close to the bed rails and

---

[3] MCL 333.20201(2)(l) specifies, with regard to restraints generally, that "[a] patient or resident is entitled to be free from mental and physical abuse and from physical and chemical restraints, except those restraints authorized in writing by the attending physician for a specified and limited time . . . ." Regarding bed rails in particular, MCL 333.21734(1) provides, in relevant part:

> A nursing home shall provide bed rails to a resident only upon receipt of a signed consent form authorizing bed rail use and a written order from the resident's attending physician that contains statements and determinations regarding medical symptoms and that specifies the circumstances under which bed rails are to be used.

4

was tangled in her restraining vest, gown, and bedsheets. They untangled her from her vest and gown and attempted to position bed wedges onto decedent's bed to prevent her from slipping into a gap that existed between the mattress and bed rail. The nursing assistants testified that they informed their supervisor that the wedges were not sticking properly and kept falling off, and that better care should be taken in that regard for all patients or else the patients could hurt or even fatally injure themselves.[4]

The next day, March 2, 1997, Hunt slipped between the rails of her bed and was in large part out of the bed with the lower half of her body on the floor but her head and neck under the bed side rail and her neck wedged in the gap between the rail and the mattress, thus preventing her from breathing. When Hunt was extricated, she was transported to a hospital. There was no recovery and, on March 4, 1997, she was taken off life support and died. The cause of her death was listed as positional asphyxia.

Plaintiff filed a suit alleging ordinary negligence against defendant in the Wayne Circuit Court in April 1998. In May 1998, defendant moved for summary disposition pursuant to MCR 2.116(C)(4) and (C)(8), on the basis that plaintiff's claims sounded in medical malpractice rather

---

[4] Whether the CENAs actually made the report, as plaintiff notes in its brief to this Court, is in dispute.

5

than ordinary negligence.  In August 1998, Judge Pamela Harwood ruled that plaintiff's complaint sounded in ordinary negligence and allowed the case to proceed.  In January 1999, Judge Harwood recused herself from the case and it was reassigned to Judge John Murphy.

In June 1999, plaintiff filed a first amended complaint still alleging ordinary negligence. It contained three counts.  These were, first, ordinary negligence "by and through" defendant's employees generally; second, negligent infliction of emotional distress; and third, gross negligence by defendant's employees generally. Plaintiff's "ordinary negligence" count—the claim at issue in this appeal—contained four distinct claims against defendant:

> (a) Negligently and recklessly failing to assure that plaintiff's decedent was provided with an accident-free environment;

> (b) Negligently and recklessly failing to train CENAs to assess the risk of positional asphyxia by plaintiff's decedent despite having received specific warnings by the United States Food and Drug Administration about the dangers of death caused by positional asphyxia in bed rails;

> (c) Negligently and recklessly failing to take steps to protect plaintiff's decedent when she was, in fact, discovered on March 1 entangled between the bed rails and the mattress;

> (d) Negligently and recklessly failing to inspect the beds, bed frames and mattresses to assure that the risk of positional asphyxia did not exist for plaintiff's decedent.

**6**

In October 1999, defendant again moved for summary disposition on the basis that plaintiff's new claims of ordinary negligence, in fact, sounded in medical malpractice. Unlike Judge Harwood, Judge Murphy, in June 2000, agreed with defendant and ruled that plaintiff's "ordinary negligence" count sounded in medical malpractice.[5] In addition, he ruled that, although ordinary negligence claims could be brought against the nursing assistants individually, these claims had not properly been pleaded. The court therefore dismissed the complaint in its entirety without prejudice.

Plaintiff appealed the dismissal to the Court of Appeals. Meanwhile, however, seeking to comply with Judge Murphy's decision, plaintiff, in August 2000, filed a notice of intent to sue in medical malpractice pursuant to MCL 600.2912b and, in February 2001, refiled her case, filing a second amended complaint alleging medical malpractice. Defendant again brought a motion to dismiss pursuant to 2.116(C)(7), on the basis that the two-year medical malpractice period of limitations had expired. Judge Murphy, in June 2001, disagreed and held that the period of limitations was tolled when Judge Harwood issued

---

[5] The trial court found that this case was indistinguishable from *Starr v Providence Hosp*, 109 Mich App 762; 312 NW2d 152 (1981), and *Waatti v Marquette Gen Hosp, Inc*, 122 Mich App 44; 329 NW2d 526 (1982).

7

her August 1998 decision until that decision was reversed by himself in June 2000. Defendant appealed this decision to the Court of Appeals.

The Court of Appeals consolidated plaintiff's appeal from Judge Murphy's June 2000 decision with defendant's appeal from his June 2001 decision. The Court of Appeals held in plaintiff's favor, finding that the case sounded in ordinary negligence.[6] The Court recognized that, having so held, the issue regarding the tolling of the period of limitations was moot. However, the Court concluded, in dictum, that if plaintiff's claim had sounded in medical malpractice, *Scarsella v Pollak,* 461 Mich 547; 607 NW2d 711 (2000), would require its dismissal with prejudice. Defendant appealed the Court of Appeals decision that plaintiff's case sounded in ordinary negligence, and we granted leave to appeal in this case and in *Lawrence v Battle Creek Health Systems*, 468 Mich 944 (2003), ordering that the two cases be argued and submitted together.[7]

## II. STANDARD OF REVIEW

In determining whether the nature of a claim is ordinary negligence or medical malpractice, as well as whether such claim is barred because of the statute of

---

[6] Unpublished opinion per curiam, issued May 21, 2002 (Docket Nos. 228972, 234992).

[7] 468 Mich 943 (2003).

limitations, a court does so under MCR 2.116(C)(7). We review such claims de novo. *Fane v Detroit Library Comm*, 465 Mich 68, 74; 631 NW2d 678 (2001). In making a decision under MCR 2.116(C)(7), we consider all documentary evidence submitted by the parties, accepting as true the contents of the complaint unless affidavits or other appropriate documents specifically contradict it. *Fane*, *supra*; see also MCR 2.116(G)(5)-(6).

### III. MEDICAL MALPRACTICE VS. ORDINARY NEGLIGENCE

The first issue in any purported medical malpractice case concerns whether it is being brought against someone who, or an entity that, is capable of malpractice. In addressing this issue, defendant argues that, because MCL 600.5838a refers to "the medical malpractice of . . . an employee or agent of a licensed health facility or agency who is engaging in or otherwise assisting in medical care and treatment," plaintiff's claim sounds in medical malpractice for the simple reason that it alleges negligence committed by an employee of a licensed health care facility who was engaging in medical care and treatment. In response, we point out that MCL 600.5838a(1) is an accrual statute that indicates when a medical malpractice cause of action accrues. Additionally, as we noted in *Adkins v Annapolis Hosp*, 420 Mich 87, 94-95; 360 NW2d 150 (1984), this statute likewise expands the

**9**

traditional common-law list of those who are subject to medical malpractice actions.[8]  However, we caution that, although § 5838a expands the category of who may be subject to a medical malpractice action, it does not define what constitutes a medical malpractice action.[9]  The fact that an

---

[8] In construing the former MCL 600.5838, in which, in the context of an accrual statute, the Legislature listed a wide array of specific health care professionals and entities who could potentially be subject to medical malpractice, we stated:

> While it is true that [the former] RJA § 5838 is an accrual provision, not a definitional section, there can be no other meaning of this language other than that [those health care occupations listed in the former § 5838] may be guilty of malpractice. Otherwise, there would be no reason to list those occupations in an accrual section.  A malpractice action cannot accrue against someone who, or something that, is incapable of malpractice.
> . . . [The former § 5838] evidenced a legislative intent to alter the common law and subject other health professionals [as opposed to physicians and surgeons only] to potential liability for malpractice.  [*Adkins,* 420 Mich 94-95.]
>
> The former § 5838 was amended by 1986 PA 178, as a result of which, the accrual provision relevant to medical malpractice actions was reenacted under the current § 5838a.  Instead of listing specific health care professionals and entities subject to medical malpractice, the current § 5838a refers generally to a "licensed health care professional, licensed health facility or agency, or an employee or agent of a licensed health facility or agency who is engaging in or otherwise assisting in medical care and treatment . . . ."

[9] Perhaps complicating an understanding of this body of law is this Court's unanimous peremptory order in 1998 in *Regalski v Cardiology Assoc, PC,* 459 Mich 891 (1998).  In

**10**

employee of a licensed health care facility was engaging in medical care at the time the alleged negligence occurred means that the plaintiff's claim may *possibly* sound in medical malpractice; it does not mean that the plaintiff's claim *certainly* sounds in medical malpractice.

The second issue concerns whether the alleged claim sounds in medical malpractice. A medical malpractice claim is distinguished by two defining characteristics. First, medical malpractice can occur only "'within the course of a

---

*Regalski*, we were presented with a case in which the Court of Appeals had held that the plaintiff's claim that the defendant's medical technician was negligent in assisting the patient's movement out of a wheelchair and onto the examining table was a matter of ordinary negligence. We reversed and concluded that this was not ordinary negligence but medical malpractice.

While the facts of that case were only briefly stated, we interpret this Court's *Regalski* holding to mean that the facts in that case led to the conclusion that the particular assistance rendered to that patient involved a professional relationship and implicated a medical judgment.

Even in the wake of *Regalski,* then, injuries incurred while a patient is being transferred from a wheelchair to an examining table (to take one example) may or may not implicate professional judgment. The court must examine the particular factual setting of the plaintiff's claim in order to determine whether the circumstances—for example, the medical condition of the plaintiff or the sophistication required to safely effect the move—implicate medical judgment as explained in *Dorris*.

In citing the medical malpractice accrual statute, MCL 600.5838a(1), in *Regalski*, we have caused some, including defendant herein, to venture that we were holding that this statute can also be understood as defining medical malpractice. This understanding is incorrect for the reasons that we have stated.

**11**

professional relationship.'" *Dorris*, *supra* at 45 (citation omitted). Second, claims of medical malpractice necessarily "raise questions involving medical judgment." *Id*. at 46. Claims of ordinary negligence, by contrast, "raise issues that are within the common knowledge and experience of the [fact-finder]." *Id*. Therefore, a court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience. If both these questions are answered in the affirmative, the action is subject to the procedural and substantive requirements that govern medical malpractice actions.

In considering whether there has been a professional relationship between the plaintiff and the defendant, *Dorris* is central to our analysis. In that case, this Court held: "'The key to a medical malpractice claim is whether it is alleged that the negligence occurred within the course of a professional relationship.'" *Id.* at 45, quoting *Bronson v Sisters of Mercy Health Corp*, 175 Mich App 647, 652; 438 NW2d 276 (1989). A professional relationship sufficient to support a claim of medical malpractice exists in those cases in which a licensed

**12**

health care professional, licensed health care facility, or the agents or employees of a licensed health care facility, were subject to a contractual duty that required that professional, that facility, or the agents or employees of that facility, to render professional health care services to the plaintiff. See *Dyer v Trachtman*, 470 Mich 45; 679 NW2d 311 (2004);[10] *Delahunt v Finton,* 244 Mich 226, 230; 221 NW 168 (1928) ("Malpractice, in its ordinary sense, is the negligent performance by a physician or surgeon of the duties devolved and incumbent upon him on account of his contractual relations with his patient.");[11] see also *Hill v Kokosky*, 186 Mich App 300, 302-303; 463 NW2d 265 (1990); *Oja v Kin,* 229 Mich App 184, 187; 581 NW2d 739 (1998).

After ascertaining that the professional relationship test is met, the next step is determining whether the claim raises questions of medical judgment requiring expert

---

[10] We held in *Dyer* that in an action for negligence in performing an independent medical examination (IME), the plaintiff's claim sounded in medical malpractice rather than ordinary negligence, but that a physician incurred only a limited form of medical malpractice liability in performing the IME. *Id*. This conclusion was based on the contractual relationship between the parties.

[11] When the *Delahunt* decision was rendered in 1928, only physicians and surgeons could be sued in medical malpractice. See, for example, *Kambas v St Joseph's Mercy Hosp of Detroit,* 389 Mich 249; 205 NW2d 431 (1973). As observed in n 8, the Legislature has since expanded the common-law list of those who potentially may be subject to medical malpractice liability. See MCL 600.5838a; *Adkins,* 420 Mich 94-95.

**13**

testimony or, on the other hand, whether it alleges facts within the realm of a jury's common knowledge and experience. If the reasonableness of the health care professionals' action can be evaluated by lay jurors, on the basis of their common knowledge and experience, it is ordinary negligence. If, on the other hand, the reasonableness of the action can be evaluated by a jury only after having been presented the standards of care pertaining to the medical issue before the jury explained by experts, a medical malpractice claim is involved. As we stated in *Dorris*:

> The determination whether a claim will be held to the standards of proof and procedural requirements of a medical malpractice claim as opposed to an ordinary negligence claim depends on whether the facts allegedly raise issues that are within the common knowledge and experience of the jury or, alternatively, raise questions involving medical judgment. [*Dorris*, *supra* at 46, citing *Wilson v Stilwill*, 411 Mich 587, 611; 309 NW2d 898 (1981).]

Contributing to an understanding of what constitutes a "medical judgment" is *Adkins v Annapolis Hosp,* 116 Mich App 558; 323 NW2d 482 (1982), in which the Court of Appeals held:

> [M]edical malpractice . . . has been defined as the failure of a member of the medical profession, employed to treat a case professionally, to fulfill the duty to exercise that degree of skill, care and diligence exercised by members of the same profession, practicing in the same or similar locality, in light of the present state of medical science.

**14**

[Citation omitted.]

## IV. ANALYSIS OF ALLEGATIONS

We now turn to the complaint in the present case.[12] Plaintiff alleges that defendant is liable for: (1) negligently failing to assure that plaintiff's decedent was provided with an accident-free environment; (2) negligently failing to inspect the bed, bed frame, and mattress to assure the plaintiff's decedent was not at risk of suffocation; (3) negligently failing to properly train its CENAs regarding the risk to decedent of positional asphyxiation posed by the bed rails; and (4) negligently failing to take steps to protect decedent from further harm or injury after discovering her entangled between her bed rail and mattress on March 1. We address the application of *Dorris* to each of these claims below.[13]

### A. PROFESSIONAL RELATIONSHIP

The first question in determining whether these claims sound in ordinary negligence or medical malpractice is whether there was a professional relationship between the

---

[12] Because the Court of Appeals majority in this case based its decision on plaintiff's June 1999 first amended complaint, we will use the claims in that complaint to analyze this case.

[13] As stated, we address only Count I of plaintiff's first amended complaint. Counts II and III (negligent infliction of emotional distress and gross negligence) may be addressed by the parties on remand in light of our decision regarding count I.

**15**

allegedly negligent party and the injured party. This analysis is fairly straightforward and, in this case, is identical for each of plaintiff's claims. Because defendant, Oakpointe Villa Nursing Centre, Inc., a licensed health care facility, was under a contractual duty requiring both it and its employees to render professional health care services to plaintiff's decedent, a professional relationship existed to support a claim for medical malpractice.

### B. MEDICAL JUDGMENT VS. LAY KNOWLEDGE

The second question is whether the acts of negligence alleged "raise issues that are within the common knowledge and experience of the jury or, alternatively, raise questions involving medical judgment." *Dorris, supra* at 46.

### 1. "ACCIDENT-FREE ENVIRONMENT"

Plaintiff's first claim is that defendant "fail[ed] to assure that plaintiff's decedent was provided with an accident-free environment." This is an assertion of strict liability that is not cognizable in either ordinary negligence *or* medical malpractice. With reference to ordinary negligence, the test is whether the defendant breached a duty that proximately caused an injury to the plaintiff. See, e.g., *Haliw v Sterling Hts,* 464 Mich 297, 309-310; 627 NW2d 581 (2001). With reference to medical

malpractice law, the Legislature has directed in MCL 600.2912a *et seq.*, that negligence is the standard. Thus, strict liability is inapplicable to either ordinary negligence or medical malpractice. As a result, because this claim is unrecognized in this area of our law, this allegation states no claim at all.

## 2. FAILURE TO TRAIN

Next, we must determine whether plaintiff's claim that defendant failed to train its staff "to assess the risk of potential asphyxia" is one that requires expert testimony on medical issues. In *Dorris* at 47, we stated that the plaintiff's allegations "concerning staffing decisions and patient monitoring involve questions of professional medical management and are not issues of ordinary negligence that can be judged by the common knowledge and experience of a jury." That is not to say, however, that *all* cases concerning failure to train health care employees in the proper monitoring of patients are claims that sound in medical malpractice. The pertinent question remains whether the alleged facts raise questions of medical judgment or questions that are within the common knowledge and experience of the jury. *Id.* at 46.

In *Dorris,* the staff training and patient monitoring issue sounded in medical malpractice because "[t]he ordinary layman does not know the type of supervision or

**17**

monitoring that is required for *psychiatric* patients in a *psychiatric* ward." *Id.* at 47 (emphasis added). That is, knowing how to correctly monitor psychiatric patients requires a specialized knowledge of the complex diseases of the mind that may affect psychiatric patients and how those diseases may influence their behavior, and such knowledge is simply not within the realm of "common knowledge."

Similarly, in order to assess the risk of positional asphyxiation posed by bed railings, specialized knowledge is generally required, as was notably shown by the deposition testimony of plaintiff's own expert, Dr. Steven Miles. Dr. Miles testified that hospitals may employ a number of different bed rails depending on the needs of a particular patient.[14] Accordingly, the assessment of whether a bed rail creates a risk of entrapment for a patient requires knowledge of that patient's medical history and behavior.[15] It is this particularized

_____

[14] Deposition Testimony of Dr. Steven Miles ("Well, first off, there's no such thing as generic side rails.").

[15] Dr. Miles testified:

> *Q.* Okay. When you indicated that [Hunt] required assistance for activities of daily living, are all persons who require assistance for such activities at risk for entrapment?

> *A.* No. As I stated in my previous comment, that the overall profile is one of being frail and disabled and having poor judgment and a history of impulsive behavior and a history of

**18**

knowledge, according to Dr. Miles, that should prompt a treating facility to use the bedding arrangement that best suits a patient's "individualized treatment plan," and to properly train its employees to recognize any risks inherent in that bedding arrangement and to adequately monitor patients to minimize those risks.

In describing the appropriate arrangement for plaintiff's decedent, Dr. Miles testified:

> This patient had a long history of slide and fall-type injuries, and her entire environment should have been adjusted as part of the individualized treatment plan for this.

> And furthermore, the facility had a general obligation to all of its patients, including Ms. Hunt, to provide beds that did no prevent—present a space that was large enough for an entrapment asphyxiation. And they should have been particularly aggressive in using that type of equipment for Ms. Hunt.

This testimony demonstrates that the ability to assess the risk of positional asphyxia and, thus, the training of employees to properly assess that risk, involves the exercise of professional judgment. The picture necessarily gets more complicated when one considers additional restraint mechanisms used in tandem with bed railing such as vests or pelvic restraints to promote the safety of patients.

-----

> previous near entrapments. These are the people who are at risk, not the presence of any one of those.

Indeed, an article in the Journal of the American Geriatrics Society coauthored by plaintiff's expert, Dr. Miles, stresses the need for "clinical and ergonomic changes" in the use of bed rails and decries the widespread use of bed railings "without . . . a clear sense of their role in a treatment plan and without regulatory attention to their design."[16]  This article concludes with a call for nursing homes to limit the use of bedrails, but notes that research into the relative costs and benefits of using bedrails is "needed urgently."[17]

This much is clear: in order to determine whether defendant adequately trained its CENAs to recognize the risks posed by particular configurations of bed rails and other prescribed restraint systems, therefore, the fact-finder will generally require expert testimony on what specialists in the use of these systems currently know about their risks and on how much of this knowledge defendant ought to have conveyed to its staff.

Given the patent need in this case for expert testimony regarding plaintiff's claim of failure to train, we conclude that this claim sounds in medical malpractice under *Dorris*.

---

[16] Kara Parker and Steven H. Miles, *Deaths caused by bedrails,* 45 J Am Geriac Soc 797 (1997).

[17] *Id.,* p 799.

### 3.   FAILURE TO INSPECT

Next, plaintiff alleges that defendant is liable for "[n]egligently and recklessly failing to inspect the beds, bed frames and mattress to assure that the risk of positional asphyxia did not exist for plaintiff's decedent." It is clear from the record in this case that plaintiff's "failure to inspect" claim is not that defendant and its agents actually failed to *check* Ms. Hunt's bedding arrangements,[18] but that defendant failed to recognize that her bedding arrangements posed a risk of asphyxiation.

As shown above, and as demonstrated through the deposition testimony of plaintiff's expert, the risk of asphyxiation posed by a bedding arrangement varies from patient to patient. The restraining mechanisms appropriate for a given patient depend upon that patient's medical history. Thus, restraints such as bed railings are, in the terminology of plaintiff's expert physician, part of a patient's "individualized treatment plan."

The risk assessment at issue in this claim, in our judgment, is beyond the ken of common knowledge, because

---

[18]   Indeed, plaintiff repeatedly stresses that defendant's agents saw the gap between the bed and the railing and failed to recognize that this gap created a risk of asphyxiation. See § IV(B)(4) later in this opinion.

such an assessment require understanding and consideration of the risks and benefits of using and maintaining a particular set of restraints in light of a patient's medical history and treatment goals. In order to determine then whether defendant has been negligent in assessing the risk posed by Hunt's bedding arrangement, the fact-finder must rely on expert testimony. This claim, like the claim described above, sounds in medical malpractice.

### 4. FAILURE TO TAKE STEPS

We turn, finally, to a claim fundamentally unlike those discussed previously. Plaintiff alleges that defendant "[n]egligently and recklessly fail[ed] to take steps to protect plaintiff's decedent when she was, in fact, discovered on March 1 [1997] entangled between the bed rails and the mattress."

This claim refers to an incident on March 1, 1997—the day before Ms. Hunt was asphyxiated—when two of defendant's CENAs found Ms. Hunt tangled in her bedding and dangerously close to asphyxiating herself in the bed rails. According to the CENAs, they moved Ms. Hunt away from the rail and informed their supervising nurses that Ms. Hunt was at risk of asphyxiation.

Plaintiff now contends, therefore, that defendant had notice of the risk of asphyxiation through the knowledge of its agents and, despite this knowledge of the problem,

**22**

*defendant did nothing to rectify it.* It bears repeating that plaintiff's allegation in this claim is not that defendant took inappropriate steps in dealing with the patient's compulsive sliding problem or that defendant's agents were negligent in creating the hazard in the first place. Instead, plaintiff claims that defendant knew of the hazard that led to her death and did nothing about it.

This claim sounds in ordinary negligence. No expert testimony is necessary to determine whether defendant's employees should have taken *some* sort of corrective action to prevent future harm after learning of the hazard. The fact-finder can rely on common knowledge and experience in determining whether defendant ought to have made an attempt to reduce a known risk of imminent harm to one of its charges.

Suppose, for example, that two CENAs employed by defendant discovered that a resident had slid underwater while taking a bath. Realizing that the resident might drown, the CENAs lift him above the water. They recognize that the resident's medical condition is such that he is likely to slide underwater again and, accordingly, they notify a supervising nurse of the problem. The nurse, then, does nothing at all to rectify the problem, and the resident drowns while taking a bath the next day.

If a party alleges in a lawsuit that the nursing home

was negligent in allowing the decedent to take a bath under conditions known to be hazardous, the *Dorris* standard would dictate that the claim sounds in ordinary negligence. No expert testimony is necessary to show that the defendant acted negligently by failing to take any corrective action after learning of the problem. A fact-finder relying only on common knowledge and experience can readily determine whether the defendant's response was sufficient.

Similarly, no expert testimony is required here in order to determine whether defendant was negligent in failing to respond after its agents noticed that Ms. Hunt was at risk of asphyxiation. Professional judgment might be implicated if plaintiff alleged that defendant responded inadequately, but, given the substance of plaintiff's allegation in this case, the fact-finder need only determine whether *any* corrective action to reduce the risk of reccurrence was taken after defendant's agents noticed that Ms. Hunt was in peril. Thus, plaintiff has stated a claim of ordinary negligence under the standards articulated in *Dorris*.

### V. STATUTE OF LIMITATIONS

Having decided that three of plaintiff's claims sound in medical malpractice, we must determine whether plaintiff's medical malpractice claims are now time-barred. See MCR 2.116(C)(7).

**24**

The period of limitations for a medical malpractice action is ordinarily two years. MCL 600.5805(6). According to MCL 600.5852, plaintiff had two years from the date she was issued letters of authority as personal representative of Hunt's estate to file a medical malpractice complaint. Because the letters of authority were issued to plaintiff on January 20, 1998, the medical malpractice action had to be filed by January 20, 2000. Thus, under ordinary circumstances, plaintiff's February 7, 2001, medical malpractice complaint (her third complaint in total) would be time-barred.

The equities of this case, however, compel a different result. The distinction between actions sounding in medical malpractice and those sounding in ordinary negligence is one that has troubled the bench and bar in Michigan, even in the wake of our opinion in *Dorris*. Plaintiff's failure to comply with the applicable statute of limitations is the product of an understandable confusion about the legal nature of her claim, rather than a negligent failure to preserve her rights. Accordingly, for this case and others now pending that involve similar procedural circumstances, we conclude that plaintiff's medical malpractice claims may proceed to trial along with plaintiff's ordinary negligence claim. MCR 7.316(A)(7). However, in future cases of this nature, in which the line

between ordinary negligence and medical malpractice is not easily distinguishable, plaintiffs are advised as a matter of prudence to file their claims alternatively in medical malpractice and ordinary negligence within the applicable period of limitations.[19]

## VI. CONCLUSION

Plaintiff has stated two claims that require expert testimony and therefore sound in medical malpractice. Although these claims were filed after the applicable period of limitations had run and would ordinarily be time-barred, the procedural features of this case dictate that plaintiff should be permitted to proceed with her medical malpractice claims. The claim that defendant negligently failed to respond after learning that Ms. Hunt's bedding arrangements created a risk of asphyxiation sounds in ordinary negligence. Finally, plaintiff's claim regarding an "accident-free environment" sounds in strict liability and is not cognizable. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the circuit court for further proceedings consistent with

---

[19] If the trial court thereafter rules that the claim sounds in ordinary negligence and not medical malpractice, and may thus proceed in ordinary negligence, and this ruling is subsequently reversed on appeal, the plaintiff will nonetheless have preserved the right to proceed with the medical malpractice cause of action by having filed in medical malpractice within the period of limitations.

this opinion.

Stephen J. Markman
Maura D. Corrigan
Elizabeth A. Weaver
Clifford W. Taylor
Robert P. Young, Jr.

27

STATE OF MICHIGAN

SUPREME COURT

DENISE BRYANT, personal
representative of the estate
of Catherine Hunt, deceased,

    Plaintiff-Appellee,

v                           Nos. 121723-121724

OAKPOINTE VILLA NURSING CENTRE,
INC.,

    Defendant-Appellant.
_____

KELLY, J. (*dissenting*).

    The question in this case is whether plaintiff's claims sound in medical malpractice or ordinary negligence. I disagree with the majority's reading of plaintiff's complaint and believe that all of plaintiff's claims sound in ordinary negligence. I also disagree with the majority's analysis of the statute of limitations issue.

BACKGROUND

    Plaintiff's decedent was a resident of defendant's nursing care facility. Among her needs were safety restraints on her bed to prevent her from falling out and injuring herself. In early 1997, defendant's nurses' assistants noted that she had developed a propensity to move around in bed. Because of her petite stature and the configuration of the bed, she was in danger of slipping

under the bedrails and catching her neck.  This could lead to strangulation and death.

Shortly after, the assistants' fears were realized. First, they discovered plaintiff's decedent "tangled up in the rails," her clothes, and the bedding.  They successfully extricated her, but feared that she was in grave danger of being hanged.  Yet, no change was made in the restraint configuration.  The next day, she was discovered caught by her neck under the rails.  This time, she did not recover.  She died two days later after being removed from life support.

Plaintiff brought suit against the facility. Following pretrial motions for summary disposition, plaintiff was allowed to file a first amended complaint in June 1999.  She alleged three counts of negligence: ordinary negligence, negligent infliction of emotional distress, and gross negligence.[1]  *Ante* at 6.  Central to the resolution of this case is plaintiff's count for ordinary negligence.

The ordinary negligence count consisted of four distinct claims.  The first was that defendant, by

_____

[1]  Plaintiff alleged that defendant negligently inflicted emotional distress on her by attempting to conceal the true circumstances of her decedent's death. The third count alleged that the nurses' assistants were grossly negligent for failing to inform their supervisors that they had found decedent entangled in her bedding the day before her death.

providing medical care and housing to plaintiff's decedent, owed her decedent a duty to provide an accident-free environment. Defendant had a duty, plaintiff asserted, to assure that plaintiff's decedent was not subjected to an unreasonable risk of injury.

Second, plaintiff asserted that defendant breached its duty to train its staff to recognize the danger posed by bedrails. According to plaintiff's complaint, defendant had received specific information about this danger from the United States Food and Drug Administration (FDA). The allegation is that defendant failed to take precautions or share this information with its staff.

Third, plaintiff asserted that defendant discovered plaintiff's decedent caught between the rails and mattress. Plaintiff complains that defendant failed to prevent a recurrence by not remedying the rails-mattress configuration.

Fourth, plaintiff asserted that defendant had failed to inspect the bed's configuration to ensure that a danger of strangulation was not present.

Defendant moved for summary disposition under MCR 2.116(C)(7), and the circuit court granted the motion. It determined that plaintiff's ordinary negligence claims were really allegations of medical malpractice.

Plaintiff appealed to the Court of Appeals. She also

took measures to preserve her claims as malpractice claims by filing an amended complaint and a notice of intent to sue pursuant to MCL 600.2912b. Defendant moved to dismiss, asserting that the suit was time-barred under the medical malpractice statutory period of limitations. MCL 600.5805(6). When the circuit court held that the statutory period had been tolled, defendant went to the Court of Appeals.

The Court of Appeals consolidated both parties' appeals. It concluded that plaintiff's claims sounded in ordinary negligence, adding that they would be barred by the limitations period if they sounded in medical malpractice. Unpublished opinion per curiam, issued May 21, 2002 (Docket Nos. 228972, 234992). We granted defendant's subsequent application for leave to appeal.[2] 468 Mich 943 (2003).

The majority determines that only one of plaintiff's claims sounds in ordinary negligence, that another is not cognizable under Michigan law, and that the other two are medical malpractice claims. It bases its holding on two facts: One, defendant did not respond at all upon finding plaintiff's decedent entangled in her bedding and, therefore, one of plaintiff's claims is for ordinary

_____

[2] We also ordered that the case be argued and submitted with *Lawrence v Battle Creek Health Systems,* 468 Mich 944 (2003).

4

negligence.  Two, the use of bedrails must be prescribed by a medical professional and, therefore, the remaining claims necessarily sound in medical malpractice.

STANDARD OF REVIEW

We review motions for summary disposition under MCR 2.116(C)(7) de novo.  We accept the allegations in the complaint and documentary evidence as true unless other documents specifically contradict them.  *Fane v Detroit Library Comm*, 465 Mich 68, 74; 631 NW2d 678 (2001).

MEDICAL MALPRACTICE VERSUS ORDINARY NEGLIGENCE

In *Adkins v Annapolis Hosp,*[3] we recognized that ordinary negligence could occur in the course of medical care.  In this case, plaintiff is alleging that ordinary negligence occurred.  She does not dispute that a professional medical relationship existed between defendant and her decedent.  But she relies on the established fact that every medical professional remains under a duty to exercise reasonable care.  Also, professional standards of medical care supplement but do not necessarily supplant the ordinary duty of care.

Various differences exist between medical malpractice and negligence.  When medical malpractice occurs, there has been a failure or omission that cannot be assessed by a

---

[3] 420 Mich 87; 360 NW2d 150 (1984).  See also *Dyer v Trachtman*, 470 Mich 45, 54 n 5; 679 NW2d 311 (2004).

layperson; it involves a matter that requires the exercise of professional medical judgment. Without expert testimony, the ordinary juror cannot determine if a defendant medical professional has fulfilled its duty of professional care. *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 47; 594 NW2d 455 (1999). By contrast, expert witnesses are not always required in ordinary negligence actions because the trier of fact can often rely on its own common knowledge and experience. In addition, medical malpractice actions involve the alleged breach of medical standards of care; negligence actions do not.

THE NEGLIGENCE ALLEGED

Here, plaintiff's amended complaint alleged that defendant was negligent in four ways. Defendant is alleged to have breached its duties to

> (a) . . . assure that plaintiff's decedent was provided with an accident-free environment;
> (b) . . . train [nurses' assistants] to assess the risk of positional asphyxia by plaintiff's decedent despite having received specific warnings . . . ;
> (c) . . . take steps to protect plaintiff's decedent when she was, in fact, discovered on March 1 [1997] entangled between the bed rails and the mattress;
> (d) . . . inspect the beds, bed frames and mattresses to assure that the risk of positional asphyxia did not exist for plaintiff's decedent.

With respect to the first claim, I disagree with the majority that plaintiff's assertion of a duty to provide an accident-free environment is not cognizable under Michigan

law.  *Ante* at 17-18.  We have consistently held that the nature of the claim alleged is based on the underlying facts.  It is independent of the words used to describe it.  See *Dorris* at 43.

Plaintiff's decedent was in defendant's custodial care.  As the Court of Appeals stated, defendant was obligated to take reasonable precautions to provide a reasonably safe environment.  Unpublished opinion per curiam, issued May 21, 2002 (Docket Nos. 228972, 234992), citing *Owens v Manor Health Care Corp*, 159 Ill App 3d 684, 688; 512 NE2d 820 (1987).  A breach of this duty can support a claim for ordinary negligence.  Plaintiff's first claim should be read to mean that defendant was obligated to provide an environment free of negligently caused accidents.

Contrary to the majority's reading of this claim, plaintiff has not asserted that defendant was the guarantor of the safety of plaintiff's decedent.  The ordinary juror can assess whether defendant's alleged actions or inactions constituted reasonable measures to fulfill its duty.

The second claim is that defendant breached its duty to train its nurses' assistants.  I agree with the majority that assessing the medical needs of patients requires medical expertise.  Similarly, assessing whether those needs were adequately addressed requires medical expertise.

7

See part IV(B)(2) *ante*. However, a fair reading of this claim reveals that plaintiff is not challenging defendant's assessment of her decedent's medical needs. Moreover, plaintiff is not challenging whether bed rails and other restraints were appropriately prescribed.

Instead, plaintiff asserts that defendant knew of the dangers posed by bed rails, yet, it took no steps to pass this information along to its employees. As the majority opines,

> [n]o expert testimony is necessary to determine whether [defendant] should have taken *some* sort of corrective action to prevent future harm after learning of the hazard. The fact-finder can rely on common knowledge and experience in determining whether defendant ought to have made an attempt to reduce a known risk of imminent harm to one of its charges.[4]

"Some sort of corrective action" may include, as plaintiff alleges, training employees or passing along specific information to them that it has learned from other employees or the FDA. Plaintiff asserts that defendant failed to act once it had knowledge of a hazard, not that it breached a medical standard of care. Hence, this claim sounds in ordinary negligence as well.

Plaintiff's third and fourth claims concern defendant's actions with respect to her decedent becoming entangled in the bedding. Plaintiff alleged that defendant

---

[4] See *ante* at 24, discussing plaintiff's claim for defendant's failure to respond after initially finding plaintiff's decedent entangled in her bedding.

failed to "take steps to protect plaintiff's decedent when she was, in fact, discovered on March 1 [1997] entangled between the bed rails and the mattress" and to "inspect the beds, bed frames and mattresses to assure that the risk of positional asphyxia did not exist for plaintiff's decedent."

Plaintiff asserts that the nurses' assistants employed by defendant failed to notify their supervisors when plaintiff's decedent was found caught in the bedrails on the first occasion. Alternatively, plaintiff asserts that a warning was given to the supervisors that they disregarded.

Again, plaintiff states: they "[n]egligently and recklessly fail[ed] to inspect the beds, bed frames and mattresses to assure that the risk of positional asphyxia did not exist . . ." and "to take steps to protect plaintiff's decedent . . . ." These allegations assert the breach of a duty of due care owed by defendant to plaintiff's decedent that can be evaluated by ordinary jurors.

Defendant's nurses' assistants were alerted to the danger when two of them first found plaintiff's decedent trapped in the bedrails. One specifically testified that, although she did not comprehend the medical needs of plaintiff's decedent, she recognized that the decedent was

9

in serious physical danger. She expressed to her supervisor her fear that the elderly woman would be found dead if something were not done.

Plaintiff has presented evidence that defendant's nurses' assistants did not require medical training to understand that this small, frail person could again slip under the bedrail and jam her neck, endangering her life. Medical training was not needed to instruct them that the bedrail-mattress configuration had to be changed.

Laypersons can properly assess whether the manner in which bedrails and mattresses are configured creates an unreasonable risk of harm to a person like plaintiff's decedent. The claims do not involve the breach of a medical standard of care. They involve simple neglect to act or ordinary negligence, as the majority concedes.

Unlike the majority, I do not place undue emphasis on the fact that the nurses' assistants had previously discovered plaintiff's decedent in a dangerous position. *Ante* at 25. Any person caring for her could have recognized the danger that the bedding posed to a petite, frail, and elderly person who lacked normal control over her movements.[5]

---

[5] One nurses' assistant testified that she recognized the dangerous bedding arrangement that entangled plaintiff's decedent on a previous occasion even though she was not plaintiff's decedent's usual caregiver. This

The danger here was similar to that experienced by an infant in a crib whose mattress is too small and whose rails allow the baby to slip through. Those caring for such a child would quickly recognize the danger, and an expert would not be required to point it out. Similarly, ordinary jurors can assess whether defendant's caregivers here should have recognized the danger and acted with due care.

As stated earlier in this opinion, the nature of the claim is independent of the words used to describe it. Plaintiff used the proper term "positional asphyxia" to describe being hanged. However, use of the medical term does not transform plaintiff's negligence claim into one sounding in malpractice.

Defendant's supposition that ordinary people are incapable of recognizing an obvious danger of hanging is untenable, particularly here where untrained people actually did recognize the danger. The assessment of a hazard does not require professional training merely because a professional is capable of assessing it as well and can explain the exact mechanism of the danger. If that were true, a physical science expert would be required in this case as well as a medical one. That expert would be

_____

assistant had not had an opportunity to observe plaintiff's decedent for a prolonged period.

11

needed to inform the jury how plaintiff's decedent was in danger of strangulation because gravity would pull her down once she slipped beneath the bedrails.

## STATUTE OF LIMITATIONS

Generally the period of limitations is tolled at the time the complaint is filed. MCL 600.5856(a). The period for an action premised on ordinary negligence is three years. MCL 600.5805(10); *Stephens v Dixon*, 449 Mich 531; 536 NW2d 755 (1995). Plaintiff's decedent died in March 1997, and plaintiff brought her action in April 1998. This was well within the period of limitations applicable to ordinary negligence actions, as well as wrongful death actions premised on medical malpractice. MCL 600.5852; MCL 600.5805(6). Still well within the applicable period of limitations, the trial court initially ruled that plaintiff's claim sounded in ordinary negligence. Thus, under MCL 600.5856(a), the period of limitations was tolled.

I believe that plaintiff and other similarly situated litigants are entitled to rely on a trial court's decision that their case sounds in ordinary negligence. The filing of plaintiff's ordinary negligence complaint tolled the period of limitations, at least until the new trial judge reversed that decision.

"Plaintiff's failure to comply with the applicable

12

statute of limitations" was less the "product of [her] understandable confusion about the legal nature of her claim . . ."[6] and more the product of plaintiff's justifiable reliance on the trial court's initial ruling.

This Court need not resort to equity to save plaintiff's so-called medical malpractice claims. MCL 600.5856(a) and the initial trial court decision dictated that plaintiff's filing of the ordinary negligence complaint tolled the running of the period of limitations.

Finally, the majority's "prudent" decision that obliges someone injured by a negligent medical practitioner to allege alternate theories of medical malpractice and ordinary negligence pertaining to a single injury is ill-conceived. It needlessly complicates and impedes the injured person's efforts to recover through the courts from those responsible for his plight. The majority's free and unsolicited advice sends the wrong message to the bench and bar, and places an undue burden on injured people.

CONCLUSION

In this case, plaintiff has alleged that defendant had notice of a risk of harm that was readily apparent to the layperson and could have been rectified by a layperson. She has also alleged that, after receiving notice of the danger, defendant negligently missed several opportunities

---

[6] *Ante* at 26.

to avert it.

Medical expertise is not required to determine whether defendant's nonresponses constituted a failure to take ordinary care. An expert could render an opinion on the issues in this case, but it is unnecessary because the case does not raise questions of medical judgment. It does not involve the breach of medical standards of care. Instead, the issues are within the common knowledge and experience of lay jurors. Hence, plaintiff should be enabled to proceed under a theory of ordinary negligence.

Moreover, if any of plaintiff's claims did sound in medical malpractice, more than the equities of this case require that plaintiff be allowed to proceed; plaintiff reasonably relied on the decisions of the lower courts that all her claims sound in ordinary negligence.

The decision of the Court of Appeals should be affirmed to the extent that it found that all of plaintiff's claims sound in negligence.

Marilyn Kelly
Michael F. Cavanagh

14