*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CEDAR SPRINGS MOBILE ESTATES,

       Plaintiff-Appellee,

v

ANGELA SMITH,

       Defendant-Appellant.

UNPUBLISHED
September 17, 2019

No. 344630
Kent Circuit Court
LC No. 17-011684-AV

Before: SWARTZLE, P.J., and GLEICHER and M. J. KELLY, JJ.

PER CURIAM.

Cedar Springs Mobile Estates' rental contracts make tenants responsible for damages caused by negligent acts. At the bench trial to evict tenant Angela Smith and collect the costs of repairing her rental unit, however, Cedar Springs' only evidence of negligence was speculative and was rebutted by Smith. On this record, the district court could not find Smith financially responsible and therefore could not support a judgment of eviction. We reverse.

## I. BACKGROUND

Angela Smith rented a mobile home and lot in the Cedar Springs Mobile Estates. On July 22, 2017, a couch in the home's living room caught fire, damaging the surrounding area. Cedar Springs paid to repair the fire damage and then attempted to recoup approximately $5,000 from Smith. When Smith did not remit these funds in addition to her normal rent payments, Cedar Springs instituted eviction proceedings in the district court and sought damages. Following a bench trial, the district court ordered Smith's eviction and also entered judgment of $6,997.10. Smith appealed that judgment to the circuit court, which affirmed.

The relationship between Smith and Cedar Springs was memorialized in two lease agreements entered on June 3, 2017—the Cedar Springs Mobile Estates Lease Agreement (Lot Lease) and the Cedar Springs Mobile Estates Home Lease Agreement (Home Lease)—and was also governed by the Cedar Springs Community Rules (Community Rules). Under the Lot Lease, Smith was required to pay $400 in monthly lot rent. Under the Home Lease, Smith was required to pay an additional $375 in monthly rent for the mobile home.

-1-

The Home Lease specifically addresses fire damage to mobile homes as follows:

> 18. <u>DESTRUCTION OF HOME.</u> If the Home is partially damaged by fire . . ., *Landlord shall make necessary repairs* as quickly as reasonably possible. If the Home is not habitable, rent will be abated until the Home is again habitable, unless the damage or destruction is due to the conduct (whether intentional or negligent) of Tenant, other members of Tenant's household, or guests or invitees of Tenant, in which case there shall be no abatement of rent. No reduction in rent shall be made if Tenant can use and occupy the Home without substantial inconvenience. [Emphasis added.]

The Home Lease more generally provides that the tenant must "maintain the Home and all fixtures and appliances in good working condition and repair." The tenant is "responsible for all repairs to Home and all fixtures and appliances" after move-in. Moreover:

> Tenant shall be liable for any damage to the Home or to Landlord's other property that is *caused by the acts or omissions (whether intentional or negligent) of Tenant*, members of Tenant's household or Tenant's guests, visitors or invitees. *Tenant shall reimburse Landlord, upon demand by Landlord, the costs of all required damage repairs/replacements.* Landlord may require advance payment for any repair for which Tenant is responsible. [Emphasis added.]

The tenant also "agrees that he will not allow anything to be done on the Home, including the operation of any equipment or machinery, which may result in imminent serious property damage to the Home. . . ."

The Lot Lease also governs the parties' duties in the event of fire, providing that the tenant remains "responsible for payment of [lot] rent" following a fire. In relation to the "maintenance of home & site," the Lot Lease provides:

> Resident must maintain the exterior of the home in accordance with the Community Rules and Regulations. In the event Resident neglects to maintain the site, Management will notify Resident to take corrective action within a reasonable number of days after the date of the written notice, and if Resident fails to bring the site into compliance within that time, Management shall have the right to enter upon the site and perform or subcontract this maintenance and charge resident for all maintenance performed.
>
> *Resident will be charged for all such maintenance as provided in the Community and Regulations. Such charges shall be deemed rent* and shall be collectable as rent. Management reserves the right to raise or lower said fees, charges, however. Resident shall be provided thirty (30) days written notice of such change. [Emphasis added.]

The Community Rules similarly provide that residents are required "to maintain the home site as required" and that if Cedar Springs must enter to make repairs, "[t]he charges incurred as a result of such maintenance shall be deemed to be rent and collectable as rent."

Both leases provide a mechanism for eviction. The Lot Lease permits Cedar Springs to "terminate this tenancy for just cause and evict Resident as provided by law if Resident defaults under this Lease. . . ." The Home Lease permits Cedar Springs to evict Smith if she "fails to pay rent or other amounts owed by Tenant under this Lease."

The subject fire rendered the mobile home uninhabitable. Cedar Springs employed a general contractor to oversee the repairs, a maintenance worker to clean the home, and an electrician. Smith and her family were able to move back into the mobile home on October 13, 2017. At that time, she submitted $1,514.28 to Cedar Springs. Smith made an additional payment of $872.28 on November 4. Pursuant to the Community Rules, ¶ IXA, these payments were applied in a specific order: "1st to dishonored check charges; 2nd to late fees; 3rd to states specific tax; 4th to water/sewer charges; 5th to other charges pursuant to these rules; 6th to delinquent rent; and 7th to current rent." The funds were applied only to the outstanding repair bills under this provision, leaving the rent balance due and owing. Cedar Springs then charged a late fee.

One month later, Cedar Springs filed in district court a "demand for possession" based on the rent arrearage. It also filed a form complaint seeking the payment of back rent and attested, "The plaintiff declares that this residential property was kept fit for the use intended and has been kept in reasonable repair during the term of the lease."

At a pretrial hearing, Cedar Springs shared its belief that the fire "was caused by an afghan sitting on top of an air conditioner, which caused the air conditioner to overheat and caught a couch on fire." Cedar Springs reprised that theory at the bench trial and claimed that an incident report prepared by the fire department supported this. The district court excluded the report from evidence, however, because Cedar Springs failed to secure the presence of the preparing officer and the report's contents would therefore be hearsay. The court reiterated its ruling later in the trial upon further motion of Cedar Springs.

Cedar Springs manager, Ranee Dewey, testified at trial regarding the extent of the damage to the mobile home, the types of repairs needed, and the cost expended. Dewey inspected the mobile home the day after the fire. Dewey observed that the damage to the home was centered in the living room "at the first window; . . . an air conditioner that was in that window with an afghan laid on the top that was charcoaled." The sofa would have been located adjacent to that window. However, during Dewey's inspection, the burnt couch was outside. The flooring and the walls "by the window" also suffered severe damage and "[t]he window was broke out." Dewey described that "the wall by the window had holes all through it and insulation pulled out; it also was saturated with water." From Smith and her family's efforts to remove the burning couch from the home, the doorway "was also charred," as was the railing on the steps to the home.

The court would not permit Dewey to give an opinion about the origin of the fire as she was not expert, but permitted her to testify regarding "what she observed." When asked, "What did you observe?", Dewey stated, "That the fire was started in the living room, at the window, where there was an air conditioner and an afagan [sic] was placed over the air conditioner." She continued, "All of the main burning of the fire was in the living room: to the living room wall, to the living room floor, the entry door."

Smith took the stand and testified that no one was in the living room when the fire started. She and her husband heard the smoke detector, came out to investigate, and found "the back of our couch was glowing on the wall." They tried to extinguish the fire with buckets of water and to use their fire extinguisher, but it would not work. They attempted to push the burning couch out the front door, but it became lodged. Smith and her family ultimately fled the mobile home through the back door. Smith denied that anyone placed an afghan on the air conditioner before the fire. The afghan had been on the couch, Smith insisted. She described, "I grabbed the blanket and tried to put the fire out and a piece of the blanket went on my foot" causing a burn. If the fire incident report described an afghan draped on an air conditioner as the fire's point of origin, Smith asserted that this would be inaccurate.

In closing, Cedar Springs argued, "[T]his was a fire that was caused by whatever they did with the trailer. They were in the exclusive possession and control of the trailer. . . . They did something or didn't do something that caused the fire." Moreover, Cedar Springs contended:

> [T]he fact that [Smith] has fairly and correctly objected to the entry of the fire department report, which gives a very clear picture of what that cause would have been, should not be something that she can use to persuade this Court that there is some other mysterious cause. The fact is, they were the only ones in possession, there was nobody from the park there, there was no stranger there, only themselves and their family and guests were in the trailer at the time the fire was caused.

> I would note that this happened on July 22nd, so that would be a good reason for the air conditioning to be on. If, in fact, there was an afghan sitting on top of it, that might cause the air conditioner to overheat, and the fire damage occurred in that place, according to the testimony of Ms. Dewey.

> This is something that [Smith] caused by . . . her own acts or omissions, and we're entitled to recover.

In reply, Smith asserted that the fire department's report did not give "a clear picture . . . as to the cause of the fire." Smith's theory was that the fire was caused by an electrical fire in the "old" mobile home and that Cedar Springs violated its duty to "keep[] this premises habitable and fit for its intended use, . . . which is as a residential premises. . . ." In the alternative, Smith contended, "We do not know what happened here, and it is [Cedar Springs'] burden to prove . . . that these damages were as a result of [Smith's] negligence." Cedar Springs had not met its burden and yet "use[d] the threat of a writ of eviction to . . . hang it over [Smith's] head to basically force her into . . . covering damages for an electrical fire that no one knows . . . whose fault it is."

Following a bench trial, the district court ruled:

> This matter is a request for possession only, not for a money judgment.

The Court finds that the Defendant was in exclusive control of the property; there was no evidence received that the fire was caused from an act of God or any other specific reason.

In reviewing exhibits 2, 3, and 4, together with exhibit A [the leases, community rules, and repair invoices], the Court accepts that the Defendant was in lawful possession of the property at the time of the fire; was responsible for maintaining the property at that time. The Court received no evidence that . . . there's any specific cause of that fire.

The Court received testimony that the Plaintiff expended a significant amount of money and labor and materials to repair the property and return it to the Defendant. The Defendant was the only one in possession.

The Court concludes that, without a finding of negligence or intentionally setting the fire, that the fire was caused by the Defendant's own acts or omissions and that the Plaintiff should not have to bear the cost of the Defendant's own acts or omissions.

The Defendant's position is they shouldn't have to pay.

\* \* \*

This is a matter for possession only. The Court finds in favor of the Plaintiff.

The circuit court affirmed the district court judgment. After quoting the relevant provisions of the Home and Lot Leases, the circuit court concluded that in order to be liable for the damages, there must be a finding that Smith committed "negligent or intentional actions/omissions." However, the doctrine of res ipsa loquitur could be relied upon to find negligent acts or omissions. The court then found that the district court did not clearly err in finding Smith liable based on that doctrine.

Smith had further defended that the leases delegated the duty to repair onto tenants in violation of the Truth in Renting Act, MCL 554.631 *et seq*. The court reasoned that MCL 554.139(2) allows parties to modify statutory duties, including the covenant to repair. As the leases limited the transfer of duty to cases where the tenant committed negligent or intentional acts, the circuit court found no statutory violation occurred.

The circuit court also rejected Smith's procedural challenge "that it was improper to treat the unpaid damages as rent and to seek eviction in summary proceedings." MCL 600.5739 permits a landlord to join claims in a summary proceeding, including those for money damages and breach of contract. Here, the court noted, the Home Lease permits Cedar Springs to seek eviction if a tenant "fails to pay rent or other amounts owed." The Community Rules require payment by a certain date and govern how those payments will be allocated. Current rent is the last item on that list. Smith continued to remit only her base rent after Cedar Springs' demand for repayment of the repair costs. Those funds were allocated to the repair costs first and the

current rent was not covered. Summary proceedings were therefore proper based on "the overdue rent and any additional damages could be joined at that time."

## II. RES IPSA LOQUITUR

On appeal, Smith challenges the lower courts' reliance on the doctrine of res ipsa loquitur to find her negligent. First, she contends that the mere occurrence of a fire does not necessarily mean that negligence occurred. Second, Smith notes that Cedar Springs had greater access to the fire scene than her and therefore could have investigated and discovered the source of the fire. Third, Smith argues that the doctrine does not apply in breach of contract actions.

We review de novo the circuit court's affirmance of the district court judgment. See *First of America Bank v Thompson*, 217 Mich App 581, 583; 552 NW2d 516 (1996). "Following a bench trial, we review for clear error the trial court's factual findings and review de novo its conclusions of law," *Ligon v Detroit*, 276 Mich App 120, 124; 739 NW2d 900 (2006), such as the applicability of res ipsa loquitur. *Jones v Porretta*, 428 Mich 132, 154 n 8; 405 NW2d 863 (1987).

In a negligence action, the plaintiff bears the burden of establishing (1) duty, (2) a breach of that duty, (3) causation, and (4) damages. *Meemic Ins Co v DTE Energy Co*, 292 Mich App 278, 281; 807 NW2d 407 (2011). Res ipsa loquitur is one way to establish negligence. "Res ipsa loquitur is a Latin term meaning, 'the thing speaks for itself.' " *Woodard v Custer*, 473 Mich 1, 6; 702 NW2d 522 (2005), quoting Black's Law Dictionary (6th ed). It has been equated to "circumstantial evidence of negligence." *Jones*, 428 Mich at 150 (quotation marks and citation omitted). "The major purpose of the doctrine of res ipsa loquitur is to create at least an inference of negligence when the plaintiff is unable to prove the actual occurrence of a negligent act." *Id*.

> According to Prosser & Keeton, Torts (5th ed), § 39, p 244, in order to avail themselves of the doctrine, plaintiffs in their cases in chief must meet the following conditions:
>
> > (1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence;
> >
> > (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant;
> >
> > (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.
>
> In *Wilson v Stilwill*, [411 Mich 587, 607; 309 NW2d 898 (1981)], this Court noted these conditions, as well as a fourth criterion: " 'Evidence of the true explanation of the event must be more readily accessible to the defendant than to the plaintiff.' " [*Jones*, 428 Mich at 150-151.]

Reliance on circumstantial evidence or the doctrine of res ipsa loquitur does not remove the plaintiff's burden of producing evidence and proving its case. Rather, " '[t]he plaintiff's

burden of proof . . . requires him to produce evidence which will permit the conclusion that it is more likely than not that his injuries were caused by the defendant's negligence." *Pugno v Blue Harvest Farms LLC*, 326 Mich App 1, 21-22; ___ NW2d ___ (2018), quoting Restatement 2d, Torts, § 328D, comment e, p 159.  The plaintiff must tip the scales of likelihood in its favor.  A defendant can even out the scales, or tip them in his or her favor, by presenting evidence tending "to show that the event was not due to his negligence." Prosser & Keeton, § 40, p 261.

We begin at the end by agreeing with Smith that res ipsa loquitur is a tort, not contract, principle.  However, the contract in this case, specifically, ¶ 14D of the Home Lease, provides that a mobile home tenant is only liable for repair costs if necessitated by intentional or negligent acts or omissions.  The contract bases the tenant's financial liability on tort concepts.  The lower courts found negligence on Smith's part under the doctrine of res ipsa loquitur and thereby found her bound by contract to pay the costs of repairing the mobile home unit.

Yet, we cannot accept Smith's proposition that fire cases do not lend themselves to res ipsa loquitur.  Caselaw supports that fire is not an occurrence that is always caused by an underlying tort.  "[F]ire is a risk incident to property and not always occasioned by negligence." *Pennsylvania R Co v Dennis' Estate*, 231 Mich 367, 370; 204 NW 89 (1925).  Although the Supreme Court later overruled *Pennsylvania R Co*'s holding that some negligence was required to hold a bailee liable for the loss of property, it continued to recognize that "fires are sometimes spawned by other than negligent conduct." *Columbus Jack Corp v Swedish Crucible Steel Corp*, 393 Mich 478, 483, 486; 227 NW2d 506 (1975).  In cases not relating to bailments, the Supreme Court has held, "We cannot presume negligence merely from the happening of [a] fire." *Holgate v Chrysler Corp*, 279 Mich 24, 31; 271 NW2d 539 (1937).

But it is an overstatement that res ipsa loquitur can *never* apply in cases involving fires of "unknown origin."  In this regard, we find instructive the following analysis in *Walker v Parish Chem Co*, 914 P2d 1157, 1161 (Utah App, 1996):

> Generally, fires of unknown origin are not the type of accident to which the doctrine of res ipsa loquitur applies.  Professors Prosser and Keeton explain:
>
> > There are many accidents which, as a matter of common knowledge, occur frequently enough without anyone's fault.  A tumble downstairs, a fall in alighting from a standing bus or street car, an ordinary slip and fall, a tire of an ordinary automobile which blows out, a skidding car, a staph infection from an operation, *a fire of unknown origin*, will not in themselves justify the conclusion that negligence is the most likely explanation; and to such events res ipsa loquitur does not apply. [Prosser and Keeton, § 39, p 246 (emphasis in *Walker*).]
>
> Common experience of the community demonstrates that fires frequently occur without any negligent act or omission.  The Idaho Supreme Court has observed, "Our common knowledge and experience, or that of a jury, would not justify the inference that the accident would not have happened in the absence of negligence in that there are many possible causes for a building fire in the absence of negligence." *Jerome Thriftway Drug, Inc v Winslow*, 110 Idaho 615; 717 P2d

-7-

1033, 1037 (1986). Furthermore, courts historically have begun analyses of the application of res ipsa loquitur to fires of unknown origin with "the postulate that the experience of humankind is that fires may and do in fact have multiple causes, some of which involve negligence and some of which do not." *Appalachian Ins Co v Knutson*, 242 F Supp 226, 237-38 (WD Mo, 1965), aff'd, 358 F2d 679, 681 (CA 8, 1966).

Nevertheless, most courts proceed from the general premise that fires of unknown origin frequently occur in the absence of negligence to examine the particular facts and circumstances of the individual fire. See, e.g., *Lanza v Poretti*, 537 F Supp 777, 787 (ED Pa, 1982); *Menth v Breeze Corp*, 4 NJ 428; 73 A2d 183, 186 (1950); *Foerster v Fischbach-Moore, Inc*, 178 NW2d 258, 263 (ND, 1970). Plaintiffs therefore are not precluded from receiving a res ipsa loquitur instruction in every case involving a fire of unknown origin. Instead, the application of the res ipsa loquitur doctrine necessarily depends upon the facts and circumstances of the particular case. Even so, plaintiffs must establish that the balance of probabilities in the specific fire weigh in favor of negligence as its cause. See *Ballow*[ *v Moore*], 699 P2d [719,] 722 [(Utah 1985)]. Moreover, that threshold requirement must be established by reference to the common experiences of the community or to expert testimony. See *id*.

Testimony in this case established that a burnt afghan was found draped on the window air conditioner *after* the fire. There is no record indication that the air conditioning unit underneath the blanket showed any signs of malfunction. No evidence was presented that the afghan was placed on the air conditioner before the fire; Dewey merely speculated that it was. And Smith testified that the afghan actually caught fire while on the couch, not on the air conditioner. On this record, it is just as likely that the fire was caused by defective electrical wiring, an electrical surge, or a weather-related event, just to give a few examples. Cedar Springs may have been able to establish the fire's origin had it presented the testimony of the fire official who prepared the fire incident report. The electrician hired to conduct repairs may even have been able to provide a reliable opinion about the post-fire condition of the appliance or the home's wiring. Instead, it relied on the speculations of a lay person who was not present during the event. It would be poor precedent to allow a plaintiff to use res ipsa loquitur to make an end run around the rules of evidence in this manner.

Cedar Springs also cannot meet the fourth condition of res ipsa loquitur as its agents had greater access to the mobile home between July 22 and October 13 and "the true explanation of the" fire was "more readily accessible" to it than Smith. Cedar Springs was given the fire incident report shortly after the event. Moreover, its agents repaired the living room where the fire took place. The repairs included electrical work. During this time, Cedar Springs had the capacity to investigate and uncover the cause of the fire. Yet, Cedar Springs did not present the individuals who conducted the repair work and did not follow the rules of evidence to have the fire incident report admitted at trial.

Absent sufficient evidence to support Smith's negligence in causing in the fire, the district court erred in finding Smith liable for the repair costs and using the nonpayment to support eviction, and the circuit court erred in affirming that judgment. Given our resolution of

this issue, we need not consider Smith's additional procedural challenge to the district court's judgment.

We reverse.

/s/ Brock A. Swartzle
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly